TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-00-00351-CR







Rochelle Reed, Appellant



v.



The State of Texas, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT


NO. 0995185, HONORABLE JULIE H. KOCUREK, JUDGE PRESIDING







 Appellant Rochelle Reed waived a jury trial and entered a not guilty plea; the trial
court found her guilty of the offense of retaliation. Tex. Penal Code Ann. § 36.06 (West Supp.
2001). Appellant's punishment, enhanced to a second-degree felony by prior felony convictions,
was assessed at imprisonment for three years.

 Appellant complains that the evidence is insufficient to sustain her conviction, the
trial court erred in admitting hearsay evidence, and that she was denied the effective assistance of
trial counsel. We affirm the judgment.

 A person commits a third-degree felony if she intentionally or knowingly threatens
to harm another by an unlawful act on account of the other's service as a prospective witness. 
Id. § 36./06(a)(1)(A). As amended, the indictment alleged that appellant on or about the
seventeenth day of August 1999 did then and there "intentionally and knowingly threaten to harm,
over the phone, another, to-wit: Eric Jeffries and Eric Jeffries' children, by an unlawful act, to
wit: by shooting Eric Jeffries' children and threatening to blow their heads off in retaliation for
and on account of the service of the said Eric Jeffries as a prospective witness."(1)

 In her sixteenth point of error, appellant insists that: "The judgment should be
reversed because the evidence was insufficient to prove beyond a reasonable doubt that appellant
threatened Eric Jeffries in retaliation for or on account of the service of Eric Jeffries as a
[prospective] witness against her."(2)

 In reviewing the legal sufficiency of the evidence, "the relevant question is whether,
after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact
could have found the essential elements of the crime beyond a reasonable doubt." Jackson v.
Virginia, 443 U.S. 307, 319 (1979); accord Patrick v. State, 906 S.W.2d 481, 486 (Tex. Crim.
App. 1995); Geesa v. State, 820 S.W.2d 154, 167 (Tex. Crim. App. 1991); Roberson v. State,
16 S.W.3d 156, 164 (Tex. App.--Austin 2000, pet. ref'd); King v. State, 17 S.W.3d 7, 13 (Tex.
App.--Houston [14th Dist.] 2000, pet. ref'd).

 In reviewing factual sufficiency of the evidence, we view "all the evidence without
the prism of 'in the light most favorable to the prosecution.'" Clewis v. State, 922 S.W.2d 126,
129 (Tex. Crim. App. 1996); Stone v. State, 823 S.W.2d 375, 381 (Tex. App.--Austin 1992, pet.
ref'd). In performing a factual sufficiency review, the courts of appeals are required to give
deference to the jury verdict and examine all of the evidence impartially, setting aside the jury
verdict "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong
and unjust." Cain v. State, 958 S.W.2d 404, 410 (Tex. Crim. App. 1997) (quoting Clewis, 922
S.W.2d at 129). Recently, the Clewis standard has been reprised, "[T]he complete and correct
standard a reviewing court must follow to conduct a Clewis factual sufficiency review of the
elements of a criminal offense asks whether a neutral review of all the evidence, both for and
against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine
confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is
greatly outweighed by contrary proof." Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App.
2000).

 We first summarize the evidence to determine its legal sufficiency of the evidence. 
In 1994, Eric Jeffries, an Allstate Insurance Company agent, met appellant when she was referred
to him by an automobile dealer. Later, Jeffries introduced appellant to his friend and customer,
Fabian Jones. Jones and appellant formed a romantic relationship that lasted "approximately a
year, two years." Appellant became pregnant, and to determine whether Jones fathered her unborn
child, they consulted a physician to obtain DNA tests. Appellant thought Jones had in his
apartment a file containing information about the DNA tests. In a telephone conversation,
appellant told Jeffries that she was going to get a locksmith to help her gain entrance to Jones's
apartment so that she could get possession of that file. Unbeknown to appellant, Jeffries taped this
conversation and alerted Jones. Jones remained in his apartment and surprised appellant and the
locksmith when they entered his apartment. Jones filed charges against appellant for burglary. 
Jeffries and Jones gave statements to the investigating officer and furnished him the taped
conversation between appellant and Jeffries.

 When appellant was tried for that burglary, Jeffries was called as a witness. Jeffries
was present in court but did not testify because appellant entered a guilty plea; appellant was
sentenced to serve a three-year prison term. Soon after being released from prison, appellant
called Jeffries at his place of business. Jeffries testified relative to the telephone call that: "She
[appellant] said, 'This is Rochelle. You thought I forgot about you, but I hadn't and I'm going
to get you. I'm going to set you up like you set me up,' and she told me that she was not going
to go after my business this time; she was going to go after me personally and my family. . . . 
She said she was going to blow my . . . kids' heads off. She felt like I set her up and was
responsible for her going to jail."

 When viewed in the light most favorable to the prosecution, this evidence was
sufficient for the trial court, as the trier of fact, to find the essential elements of the crime charged
beyond a reasonable doubt. The evidence is legally sufficient to support the judgment.

 We review the remaining evidence to determine whether the evidence is factually
sufficient. The evidence that Jeffries was a prospective witness in appellant's trial for burglary
of Jones's apartment is not disputed. However, appellant vehemently denies threatening Jeffries
by telling him she would blow his children's heads off. The State's case was dependent upon
Jeffries's credibility and appellant's defense was dependent upon her credibility.

 Apparently to resolve the credibility issue, evidence was offered, by both the
defense and the prosecution, that included the relationship that existed between appellant and
Jeffries for six or seven years. Appellant and Jeffries's versions of the relationship were quite
different. Jeffries adamantly maintained that he never had a sexual relationship with appellant. 
He testified that they had a business relationship in which she referred clients to him and he had
assisted her in locating a house. Jeffries testified that soon after they met, appellant told him that
Dee Brown, a Boston Celtic basketball player, wanted to marry her and wanted to buy her a house
in Austin. Jeffries said appellant paid him $500 or more a week for several weeks while he
assisted her in finding a suitable house. After looking at many houses, they found one that
appellant liked which was priced in excess of $600,000. Jeffries then obtained the help of a realtor
to assist in the negotiations for the house. When Brown was contacted concerning the house,
Brown's lawyer responded that Brown was married and did not know appellant. Jeffries claimed
this episode damaged his reputation with the realtor.

 The thirty-one-year-old appellant testified that she had three children and had lived
in Austin all of her life. She admitted that she had been convicted previously of "a few
misdemeanor theft by check" cases and of five felonies--"Theft by check, aggravated theft,
burglary of a habitation, food stamp fraud, securing execution by deception."

 Appellant testified she met Jeffries in October 1994 when she bought insurance for
a new car. Speaking of Jeffries, a former professional football player, she testified: "We had a
sexual relationship, but we never went out because he was married." This relationship began, "at
a Super Bowl party with present and past NFL football players. This was January 30, 1995 when
we first had sexual intercourse." According to appellant, her romantic relationship with Jeffries
continued until "about 1997." Jeffries would come to the duplex where appellant lived "on
Aberdeen off of Rundberg." However, Jeffries "didn't like the idea of the maintenance man would
come into my duplex and, you know, one day I came home, I had a washer and dryer and $100
on the bar. He didn't like that, so he put me in a duplex in Anderson Mill at Hunter's Chase." 
Jeffries was the property manager of the duplex to which he moved appellant. Jeffries helped
appellant register her three children in the elementary school across the street from the new
duplex. Appellant did not pay any rent for her new duplex. Sometimes Jeffries would make
appellant's car payments. Jeffries would come to the duplex to fix the plumbing. "[W]e would
have sex. It started in the garage, over the whole house. . . . He put me up right around the block
from his house."

 Appellant testified that Jeffries's testimony that they went around town looking at
expensive houses was total fiction. However, appellant recalled one occasion when she
accompanied Jeffries to visit one of Jeffries' friends at the friend's place of work. Jeffries and the
friend had played football together and the friend had later played for the Philadelphia Eagles. 
Near the friend's place of work, they stopped and looked at a house "that was just extravagant."

 Appellant testified that she went to Jamaica with Jeffries and a group of people
including Jeffries's wife. After the check appellant had written to pay for her trip "bounced,"
Jeffries paid for appellant's trip. While they were in Jamaica, "as soon as his wife passed out from
drinking, he would come get me from my room or come to my room."

 Appellant's recollection of meeting Fabian Jones was different from that of
Jeffries's account. She testified:


A. Me and Eric Jeffries, we just came from lunch. And Fabian came to pay his
car insurance before he went to work. And I noticed he was looking at me and
I was looking at him. So I got his telephone number off his application, and
so I called him at home, you know. And when I called him, I didn't say who
-- I said I was Rochelle Reed with MCI. That's how I started the
conversation. And then I was just like, "Look. I'm the girl in the white
Mustang convertible that you seen at Allstate today." And that's how we met.


Q. Did -- were you still in a romantic relationship with Mr. Jeffries at the time?


A. Yes.


Q. Did Mr. Jeffries become aware of your then starting to see Mr. Jones?


A. Yes. He had Mr. Jones' address and he would come leave notes on my car
when he knew I was over there or he would call me on my cell phone while 
I was upstairs in the apartment.


Q. Was he happy about your seeing Mr. Jones?


A. No.


Q. Now, during the course of all this interrelated situation, did you make
complaints with Allstate about Mr. Jeffries?


A. Yes.


Q. And did that have something to do with an insurance policy for your daughter?


A. Yes.


Q. And what was the situation with your daughter and your need for insurance?


A. . . . I wanted to get life insurance through Allstate for her.


 . . . And Mr. Jeffries told me she got approved and everything. And I was
paying money for this policy that never existed, and when I asked him for a
copy of it, he would always say that he'll bring it over to the house. And
finally in '97 I just called the Allstate business office and asked them did my
daughter have a policy and could I have a copy of it. And they told me that
my daughter was denied.


Q. So that's what you made a complaint to some of the Allstate people about?


A. Yes.


Q. And you have also made a complaint to one of the officers that testified here
the other day?


A. Yes. I never met him physically. I guess that was him that I talked to over
the phone. I never met him physically.


Q. I believe Officer Toney or Tones, whatever?


A. Yes.


Q. Now, can you remember approximately what date, month and year was this
incident where you went into Mr. Jones' apartment?


A. I could say it was February of '98.


Q. That's --


A. I could say it's around February '98.


Q. Okay. And ultimately there was a warrant issued and you were arrested for
that case, correct?


A. Yes, sir.


Q. All right. And you ultimately pled --


A. Guilty.


Q. -- guilty to that case and the other cases. And that was --


A. Aggravated theft.


Q. No, no. That was when?


A. That I pled guilty? July 7, 1998.


Q. Okay. And you then went to TDC or state jail?


A. I went to TDC September 4, 1998.


Q. All right. Then did you spend your whole time in the TDC unit?


A. Yes, I did. And not the whole time. I was bench warranted back June 26th,
1999 to testify against Cleve Moten.


* * * * *



Q. Yes. They were looking to see if you were aware of any illegal activities on
his part, right?


A. Yes.


Q. Now, you then got out of TDC in August, correct?


A. August 10 on a Tuesday.



 Appellant testified that she served nine months in prison and found it very
unpleasant; she resolved to "do everything right." She went to the Department of Public Safety
to renew her driver's license. She found that there was another Rochelle Reed, and that there was
an unserved felony warrant for the arrest of the other Rochelle Reed. This prompted appellant to
talk to a DPS officer who explained how she could get a new driver's license number. To drive
her car, appellant knew she would have to obtain liability insurance.

 Appellant called A-1 Insurance Agency and was told to call back later. She
testified:


Q. And did you make the call again?


A. Yes.


Q. And what occurred on this call?


A. I told him that I called earlier. I gave him my name. I started to give him the
model and make of the vehicle. And then he said, "Ms. Reed." And when he
said "Ms. Reed," my heart dropped.


Q. And why was that?


A. Because Eric Jeffries is the only one -- male that ever called me Ms. Reed.


Q. So you identified yourself by name?


A. I told him my name.


Q. And then you stated your car, and then he interrupts with that.


A. Yes, he told me he was there by his self.


Q. Okay. So did you -- did he say who he was or did you realize?


A. I realized who he was.


Q. And were you surprised to hear his voice?


A. Yes. I been to that office before, but he told me he was selling Primeco
telephones.


Q. And you weren't aware that he was selling insurance with A-1?


A. No, I thought his insurance days were over with.


Q. So then what happened and what kind of conversation took place?


A. It wasn't much of a conversation. He told me he was there by his self and
come over for the chair. And I hung up the telephone. That was it.


Q. And what did you interpret that to mean?


A. The chair? Sex. We called it with our pet names. We called it the chair.


Q. And when had been the last time you had had any communication directly with
him?


A. Before I went to TDC during the conversation with the burglary of a
habitation.


Q. And you recognize Sergeant Canales was the one that investigated that?


A. Yes, he was the detective that was on the case.


Q. And back at that point in that burglary investigation, did you acknowledge, to
the sergeant at least finally at some point, that you had been involved with
both of these individuals?


A. Yes. I told him, but he told me he already knew that.


Q. And who had he talked to prior to you?


A. Eric Jeffries and Fabian Jones.


Q. And so he seemed to acknowledge that he knew you had been romantically
involved with both of those people?


A. Yes, yes.


Q. Now, Rochelle, when you made this call -- let me rephrase that. At any time 
did you make a call to Eric Jeffries in August of 1999 threatening him in any
manner?


A. No, sir.


Q. Is Eric Jeffries aware of your problems, criminal problems from the past?


A. Yes.


Q. So he would be aware that you have convictions from the past; is that right?


A. Yes.


Q. Would he be aware that maybe some people might doubt your word because
of that?


A. Oh, yes. He knows that. He got upset with Skip Roberts because they
believed me and he brought that up to my attention. He couldn't believe that
they took a statement from a convicted felon.


Q. What reasons do you believe that Eric Jeffries would have to hold a grudge or
be mad at you?


A. I can answer the question? Because I turned Eric in for the money at Allstate. 
He was not only using me, he was trying to blame his secretary for stealing
money. He had just gotten in a real financial bind.


Q. And was he mad that you ultimately finally ended the sexual relationship you
had with him?


A. Yes, I couldn't take it no more.


Q. And do you know whether or not he ever revealed any of this to his wife?


A. I don't think -- if he's denying it to you all, I know he denied it to his wife.



 As appellant was about to finish her testimony, she was asked:


Q. Now, Rochelle, obviously you know that there's -- from your past history, at 
least in the last 10 years or so, there are many reasons why this judge might
have doubts to believe your word; is that right?


A. Right.


Q. And is there any reason in particular that you think, why should she believe
your word in this case?


* * * * *



A. In the past when I have done bad things and made up things and got a plot and
I contacted Eric Jeffries, I got taped. And I wouldn't have called Eric again
and threaten his kids, knowing he could possibly tape me again. And when
he asked me to come by the office, I knew that that was not the place to go
because when I went to TDC, I knew when I got out I had to make a change
and going back to old habits was going to land me right back in TDC. And
I did not want to go over to Eric Jeffries' office when he asked me to come
over there. I know I committed crimes. I pled guilty to all of those. I did my
time, and when I got out of TDC, I never wanted to go back to jail, ever.



 Michael Canales a detective with the Austin Police Department investigated the
"unique" burglary of Fabian Jones's apartment. Canales interviewed and obtained statements from
Jones, Jeffries, and appellant. Canales had the taped conversation between appellant and Jeffries
in which appellant told Jeffries of her plan to enter Jones's apartment to obtain DNA reports. 
After appellant made her first sworn statement denying that she entered Jones's apartment, Canales
testified he played a portion of the tape for appellant. Appellant became nervous and said she
would change her earlier statement and tell the truth. In her second statement, appellant stated that
she entered Jones's apartment because she had been raped.(3) Later appellant called Canales and
told him Jeffries had threatened her. In his interview with Canales, Jeffries told Canales that he
was concerned that appellant would retaliate against him. Canales affirmed that it was clear that
the burglary "was based on these DNA records." The DNA records that Canales saw "appeared
to be DNA records between Ms. Reed and Mr. Jones." Canales testified that he was familiar with
appellant's reputation for telling the truth and that he "wouldn't put much credibility on it."

 Troy Gay, an Austin Police Department employee, testified that on August 19,
1999, he had a conversation with appellant. Appellant wanted to renew her complaint of
aggravated assault against Fabian Jones. After making her original complaint about this alleged
offense, appellant asked that the case be closed because she was "pregnant" and because there were
"some complications." Because it was still within the statute of limitations, Gay reopened the case
and assigned it to another detective.

 Daniel Toney, a detective with the Austin Police Department, testified that on
March 20, 1998, appellant called him wanting him to follow up on a theft complaint she had made
March 8, 1998. Appellant had accused Jeffries of stealing $11,000 of her money. Appellant
claimed she had paid this amount of money over a period of about two years to Jeffries to pay
insurance premiums, but that Jeffries had not applied the money for insurance premiums. Because
appellant had not furnished any documentation to support her claim, Toney testified, the
investigation was suspended until appellant furnished more evidence.

 Nelson Roberts, an agency manager for Allstate Insurance Company, testified that
he had been Jeffries's agency manager from May 1996 until Jeffries left the company in September
1997. Roberts testified that Jeffries's reputation for truth and veracity was bad. Roberts's own
opinion of Jeffries had not been influenced by appellant's complaints against Jeffries.

 Sergeant Aaron Ard, a DPS officer, testified that in August 1999 he met with
appellant. Appellant inquired about having her driver's license number changed. Ard discussed
with appellant the documentation necessary for her to have her driver's license number changed. 
Ard assumed that appellant would return with the necessary documentation to have her driver's
license number changed, but she did not return.

 In our neutral review of all of the evidence, we do not find that the proof of guilt
is so obviously weak as to undermine confidence in the trial court's determination of guilt, or that
although adequate if taken alone, is greatly outweighed by contrary proof. Therefore, we hold
that the evidence is factually sufficient to support the judgment of the trial court. Appellant's
sixteenth point of error is overruled.

 In her fifteenth point of error, appellant urges that the judgment should be reversed
because the trial court erred in admitting irrelevant hearsay evidence over objection of trial
counsel. Appellant argues that the trial court 


erred in admitting evidence in the form of testimony from Michael Canales, over
objection of counsel for appellant, that Eric Jeffries as a result of his statement
implicating appellant in the burglary case, expressed concern for his safety, that
appellant was manipulative, that she would retaliate against him for helping the
police and the State, and that his demeanor indicated that he was concerned for his
safety.



Officer Canales was asked: "And when you took Mr. Jeffries' statement in regard to the burglary,
did he express any concern for his safety as a result of that statement?" Canales responded: "Yes,
sir, he did." No objection having been made, Canales was then asked: "Specifically, what did he
express to you at that time?" Defense counsel objected "on the grounds of relevancy." After
hinting that another objection might be appropriate but no other objection being made, the trial
court observed the question called for hearsay. However, appellant never objected on that ground. 
The court stated: "I am going to go ahead and let it in because I will sort it all out. If it's not to
be considered, I won't consider it."

 To preserve a complaint for appellate review, the record must show that the
complaint was made to the trial court by a specific, timely objection and that the trial court either
expressly or implicitly ruled on the objection. Tex. R. App. P. 33.1(a)(1), (2). Here the question
was asked and answered before counsel objected. The objection was not timely. See Dinkins v.
State, 894 S.W.2d 330, 355 (Tex. Crim. App. 1995). Counsel untimely objected on the "grounds
of relevancy" but on appeal complains of hearsay. The point of error does not comport with her
trial objection even if her trial objection had been timely. Because the error complained of on
appeal does not comport with the trial objection, the complained of error was not preserved for
appellate review. See McFarland v. State, 845 S.W.2d 824, 838 (Tex. Crim. App. 1992); Rezac
v. State, 782 S.W.2d 869, 870 (Tex. Crim. App. 1990). Furthermore, the trial court's ruling was
ambivalent and may be interpreted as sustaining appellant's objection. For these several reasons,
the record does not show that the error complained about on appeal, if error, was preserved for
appellate review. Appellant's fifteenth point of error is overruled.

 In fourteen points of error, appellant contends that her trial counsel was ineffective
because counsel:


 1. failed to object to inadmissible evidence that appellant allegedly threatened
complainant in an unrelated incident;


 2. failed to object to inadmissible evidence that appellant had reported that 
Jeffries had threatened her;


 3. failed to object to inadmissible evidence that appellant has asked Jeffries not
to testify against her in a prior case;


 4. failed to object to inadmissible testimony by Jeffries that appellant had tried
to influence him to withhold evidence in a prior case;


 5. failed to object to inadmissible testimony that appellant told Jeffries, the
complainant and witness, of her plans to commit a burglary;


 6. failed to object to inadmissible hearsay evidence from Canales concerning
alleged statements made by Jeffries;


 7. failed to object to inadmissible testimony from Jeffries concerning appellant's
plan to burglarize Jones' residence;


 8. failed to object to certain testimony from Canales on the grounds that the
admission of the evidence violated the Sixth Amendment;


 9. failed to object to inadmissible evidence from Canales concerning a statement
made by appellant in a prior case;


10. failed to object to irrelevant testimony of appellant on cross-examination
concerning a statement she gave in a prior case;


11. failed to object to inadmissible hearsay evidence of an alleged extraneous act;


12. failed to object to inadmissible irrelevant evidence;


13. elicited damaging inadmissible evidence and opened the door to other
damaging evidence;


14. elicited damaging testimony concerning appellant's relationship with Jones.



 To show ineffective assistance of counsel, appellant must show that: (1) counsel's
performance was deficient, in that counsel made such serious errors that he was not functioning
effectively as counsel; and (2) the deficient performance prejudiced the defense to such a degree
that appellant was deprived of a fair trial. Strickland v. Washington, 466 U.S. 668, 687 (1984); 
Hernandez v. State, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986); Shaw v. State, 874 S.W.2d 115,
118 (Tex. App.--Austin 1994, pet. ref'd); O'Hara v. State, 837 S.W.2d 139, 143 (Tex.
App.--Austin 1992, pet. ref'd). Counsel's performance is to be judged by the "totality of
representation" provided. Strickland, 466 U.S. at 690; Butler v. State, 716 S.W.2d 48, 54 (Tex.
Crim. App. 1986). In deciding an ineffective-assistance claim, this Court must judge the
reasonableness of counsel's challenged conduct on the facts of the particular case, viewed at the
time of counsel's conduct--not by hindsight. Butler, 716 S.W.2d at 54. We must then determine,
in light of all the circumstances, whether the acts or omissions are outside the wide range of
professionally competent assistance. Strickland, 466 U.S. at 690. Appellant bears a heavy burden
to prove his ineffective-assistance claim. Id. Counsel is strongly presumed to have provided
adequate assistance and to have made all significant decisions in the exercise of reasonable
professional judgment. Id.

 By failing to raise the issue of ineffective assistance of counsel in the trial court,
appellant did not waive her constitutional right to complain of ineffective assistance of counsel. 
See Robinson v. State, 16 S.W.3d 808, 812 (Tex. Crim. App. 2000). However, rarely will the
record on direct appeal be sufficient to prove that counsel's performance was deficient. Id. at 813
n.7; Thompson v. State, 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999).

 In determining whether trial counsel's performance was deficient, we do not
speculate about counsel's trial strategy. Blevins v. State, 18 S.W.3d 266, 271 (Tex. App.--Austin
2000, no pet.); Mayhue, v. State, 969 S.W.2d 503, 510 (Tex. App.--Austin 1998, no pet.). 
Moreover, there is a strong presumption that trial counsel's conduct was within the range of
reasonable professional assistance. Thompson, 9 S.W.3d at 814. This burden requires the
appellant to bring forward a record from which we may discern that trial counsel's performance
was not based on sound strategy. Blevins, 18 S.W.3d at 271. Without an evidentiary hearing,
either on a motion for new trial or on a collateral attack on the judgment, rarely can it be shown
that counsel's performance was not based on sound strategy.

 This is not the rare case. Nothing in this record reveals counsel's trial strategy in
regard to his alleged deficient performance. Although we do not speculate on counsel's strategy,
in this case, the trier of fact had to determine whether the testimony of the complainant or the
appellant was more credible. There is testimony in the record that the reputation of both the
appellant and the complainant is such that neither was worthy of belief. Perhaps trial counsel
believed that all of the evidence about their relationship would convince the trier of fact that
appellant's testimony was more credible. That trial counsel's strategy was not successful is not
the test of whether he rendered effective assistance of counsel. Examination of the record on
direct appeal fails to show that trial counsel's performance was not based on sound trial strategy.

 We hold that appellant has not overcome the strong presumption that her trial
counsel's strategy was reasonable. We overrule appellant's points of error in which she claims
she did not receive effective assistance of counsel.

 In her seventeenth point of error, without further argument or citation of authority,
appellant contends that "harm is established by the cumulative impact of the errors." A point of
error based upon the cumulative effect of the errors is not a proper point of error, and presents
nothing for review. Stoker v. State, 788 S.W.2d 1, 18 (Tex. Crim. App. 1989); Hollis v. State,
509 S.W.2d 372, 375 (Tex. Crim. App. 1974); Amis v. State, 910 S.W.2d 511, 520 (Tex.
App.--Tyler 1995, pet. ref'd); Lape v. State, 893 S.W.2d 949, 953 (Tex. App.--Houston [14th
Dist.] 1994, pet. ref'd); McDuffie v. State, 854 S.W.2d 195, 220 (Tex. App.--Beaumont 1993,
pet. ref'd). Appellant's seventeenth point of error is overruled.

 The judgment of the trial court is affirmed.



 

 Carl E. F. Dally, Justice

Before Chief Justice Aboussie, Justices Patterson and Dally*

Affirmed

Filed: February 8, 2001

Do Not Publish



* Before Carl E. F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment. 
See Tex. Gov't Code Ann. § 74.003(b) (West 1998).

1. In another paragraph, it was alleged that appellant had previously been convicted of
three felony offenses. Appellant pled "true" to these alleged prior convictions. Proof of any one
of these prior convictions raised the punishment for the charged offense from a third degree felony
to a second degree felony.
2. A "global" point of error, such as this, complaining of the insufficiency of the evidence
does not properly raise factual sufficiency for appellate review. Martinets v. State, 884 S.W.2d
185, 189 (Tex. App.--Austin 1994, no pet.). "After a court of appeals has determined that the
evidence is legally sufficient under Jackson [v. Virginia , 443 U.S. 307 (1979)] to support the
verdict, it may proceed further to review factual sufficiency if it is properly raised." Clewis v.
State, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996) (emphasis added); accord Davila v. State,
930 S.W.2d 641, 648 (Tex. App.--El Paso 1996, pet. ref'd). Although factual sufficiency has not
been properly raised by a separate point of error, we will, in the interest of justice, review the
factual sufficiency of the evidence.
3. Appellant later confessed that her second statement that she had been raped was untrue. 
She was trying to make Jones feel sorry for her.


will the
record on direct appeal be sufficient to prove that counsel's performance was deficient. Id. at 813
n.7; Thompson v. State, 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999).

 In determining whether trial counsel's performance was deficient, we do not
speculate about counsel's trial strategy. Blevins v. State, 18 S.W.3d 266, 271 (Tex. App.--Austin
2000, no pet.); Mayhue, v. State, 969 S.W.2d 503, 510 (Tex. App.--Austin 1998, no pet.). 
Moreover, there is a strong presumption that trial counsel's conduct was within the range of
reasonable professional assistance. Thompson, 9 S.W.3d at 814. This burden requires the
appellant to bring forward a record from which we may discern that trial counsel's performance
was not based on sound strategy. Blevins, 18 S.W.3d at 271. Without an evidentiary hearing,
either on a motion for new trial or on a collateral attack on the judgment, rarely can it be shown
that counsel's performance was not based on sound strategy.

 This is not the rare case. Nothing in this record reveals counsel's trial strategy in
regard to his alleged deficient performance. Although we do not speculate on counsel's strategy,
in this case, the trier of fact had to determine whether the testimony of the complainant or the
appellant was more credible. There is testimony in the record that the reputation of both the
appellant and the complainant is such that neither was worthy of belief. Perhaps trial counsel
believed that all of the evidence about their relationship would convince the trier of fact that
appellant's testimony was more credible. That trial counsel's strategy was not successful is not
the test of whether