Gregory John MAYHUE, a/k/a
Farrell, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 03–96–00444–CR, 03–96–00445–CR.

Court of Appeals of Texas,
Austin.

May 7, 1998.

Keith S. Hampton, Austin, for appellant.

Ken Anderson, Dist. Atty., John M. Bradley, Asst. Dist. Atty., Georgetown, for state.

Before YEAKEL, C.J., and ABOUSSIE and JONES, JJ.

YEAKEL, Chief Justice.

Appellant Gregory John Mayhue appeals his convictions for aggravated sexual assault of one child and sexual assault of another child. *See* Tex. Penal Code Ann. §§ 22.011, .021 (West Supp.1998).[1] A jury convicted Mayhue and assessed his punishment at fifty years' imprisonment and a $10,000 fine, and twenty years' imprisonment and a $10,000 fine, for the offenses respectively. The sentences run concurrently. We will affirm the convictions.

## BACKGROUND

The events forming the basis of Mayhue's convictions occurred on two separate occasions and involved two different victims.[2] One victim in this case is J.M., who was thirteen years old at the time of the alleged offense against her. J.M. is the biological daughter of Mayhue's brother, Michael. After J.M. was born, her mother married Michael. The couple divorced after a short time. While J.M. was still an infant, J.M.'s mother became involved with Mayhue. The two eventually became husband and wife at common law. Thereafter, Mayhue referred to J.M. as his own daughter, and J.M. apparently referred to Mayhue as her father. Mayhue and J.M.'s mother eventually separated, but the couple had not divorced at the time of trial. They both lived in the same city during the periods of time relevant to this case. J.M. sometimes lived with her mother and at other times lived with Mayhue.

The other victim in this case is M.S., who was J.M.'s friend and was in the same grade at school as J.M.

According to M.S., she and J.M. planned on September 3, 1995 to meet their boyfriends at a hotel room. M.S. told her mother she would be spending the night with J.M. at Mayhue's apartment. The girls departed Mayhue's apartment with their boyfriends in the early evening. Soon thereafter, M.S.'s mother came to the apartment looking for M.S. Mayhue did not disclose that he knew where the girls were. When M.S.'s mother left, Mayhue called the girls and told them they should return to the apartment. When they returned, the girls and Mayhue contrived a story to tell M.S.'s mother about where the girls had been when she came looking for them. After she called her mother, M.S. alleges, J.M. approached her and

---

1. The legislature amended the applicable sections of the Penal Code after the alleged offenses occurred. The prior version of the law is applicable to this case. *See* Act of May 29, 1993, 73d Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3618, Act of May 16, 1995, 74th Leg., R.S., ch. 273, § 1, 1995 Tex. Gen. Laws 2611, and Act of May 29, 1995, 74th Leg., R.S., ch. 318, § 6, 1995 Tex. Gen. Laws 2734, 2736 (Tex. Penal Code Ann. § 22.011, since amended); Act of May 29, 1993, 73d Leg., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3620 (Tex. Penal Code Ann. § 22.021, since amended). However, post-offense amendments are not relevant to this case. We, therefore, cite the current code for convenience.

2. The State investigated both offenses together and several of the State's witnesses had information about both offenses. The State prosecuted both offenses in a single trial. Mayhue agreed to the single trial in order to avoid the possibility that any sentences imposed be stacked. *See* Tex. Penal Code Ann. § 3.02; Act of May 29, 1993, 73d Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3592 (Tex. Penal Code Ann. § 3.03, since amended) (subsequent amendment allows court to stack sentences for convictions of this type, even when tried in single trial). Furthermore, Mayhue briefed his appeals of both convictions in a single brief. For these reasons, we address the appeals together.

told her the only way Mayhue would allow the girls to return to the hotel would be if M.S. had sex with him. According to M.S., she and Mayhue smoked marijuana in his bedroom and then had sexual intercourse. Afterwards, M.S. alleges, Mayhue told her to take a shower so she would be "clean and fresh" for her boyfriend. Mayhue then allowed the girls to return to the hotel room with their boyfriends. M.S. was fourteen years old at the time of this incident.

Several weeks after the encounter, M.S. told the police about the incident. The police investigated by questioning the girls' boyfriends. Both men confirmed M.S.'s story with regard to the plan to spend the evening at the hotel and the fact that the girls had returned to Mayhue's apartment for part of the evening. Moreover, M.S.'s boyfriend told officers M.S. confided in him at the hotel that she had had intercourse with Mayhue when the girls returned to Mayhue's apartment that evening.

During their investigation, officers asked M.S. to call Mayhue on the telephone from the police station; they recorded the conversation. During the course of the conversation, Mayhue made several comments that can be construed as incriminating. For example, when M.S. told him her mother suspected something about the night the girls went to the hotel, Mayhue offered to lie to M.S.'s mother and say the girls were at his apartment all night. He repeatedly suggested that M.S. would get several men or boys in trouble, including himself, if she continued to allow her mother to receive information. He referenced another older man M.S. purportedly slept with, noted that the man was only a "couple years" younger, and suggested it would be "unfair" to get in trouble if that man did not. Furthermore, Mayhue chastised M.S. that "guys who are older than [her] trust [her] to be a woman, not a little kid." In general, Mayhue's tone and comments on the recording reveal a strong desire to cover up the events of the evening. Furthermore, the conversation sometimes included references to M.S.'s prior sexual experiences with others, suggesting Mayhue may have been concerned about being accused of some sexual offense involving M.S.

During the course of their investigation of the offense against M.S., officers questioned J.M.'s boyfriend. He told investigators that the evening M.S. called Mayhue on the phone, Mayhue summoned J.M. and him to meet with Mayhue and "get their stories straight" about the evening the girls went to the hotel. In addition, the boyfriend told the investigators facts that suggested Mayhue had also assaulted *J.M.* on a different occasion. The boyfriend, who was nineteen years of age, admittedly maintained a sexual relationship with J.M. himself during the period of time the events between Mayhue and J.M. came to light.

Upon receiving this information from J.M.'s boyfriend, law enforcement officers went to J.M.'s school to speak with her. One of the officers, Lieutenant Mary Ryle, testified J.M. initially denied that Mayhue had ever had sexual contact with her. However, upon further questioning, J.M. told Ryle that Mayhue had in fact made her fellate him.

The day after J.M. first spoke with the police, Lieutenant (now Captain) Dan Lemay went to speak with Mayhue. Lemay recorded his conversation with Mayhue on an audio cassette. Lemay made it clear that Mayhue could speak with an attorney if he wanted to, but that Mayhue was not yet under arrest. When Mayhue told Lemay he was scared, Lemay told Mayhue he should be scared, that this was a serious matter, and that it was a "done deal." Lemay also told Mayhue he already had evidence Mayhue had abused J.M. and M.S.; he urged Mayhue to explain his side of the story. Mayhue complied, making several incriminating statements over the course of the conversation. After the conversation, Lemay asked Mayhue to come to the police station within fifteen minutes. Mayhue agreed, but fled after Lemay left the immediate area. Lemay followed Mayhue for some distance, but was unable to apprehend him that day.

J.M.'s mother assisted the police in locating Mayhue, and the police arrested him. Several weeks later, J.M., her boyfriend, and her mother each wrote letters to the district attorney's office in an attempt to withdraw their earlier cooperation in the case.

Nevertheless, the State prosecuted Mayhue for committing aggravated sexual assault against J.M. by penetrating her mouth with his penis. *See id.* § 22.021. The State also prosecuted him for committing sexual assault against M.S. by causing his penis to contact her vagina. *See* Tex. Penal Code Ann. § 22.011. The State called as witnesses both victims' boyfriends, Mary Ryle, Dan Lemay, the two victims, and J.M.'s mother. J.M. and her mother did not cooperate with the State at trial. In fact, J.M. denied that Mayhue committed the crime and she testified that M.S. was lying about what happened at Mayhue's apartment on the night the girls went to the hotel. The State also called another thirteen-year-old girl, S.N., who testified that she had had sexual intercourse with Mayhue several times. Additionally, the State played the tape of Mayhue conversing with M.S., as well as the tape of Mayhue conversing with Lemay. The court allowed the State to publish an unofficial transcript of the latter to the jury as an aid while they listened to the tape. Lemay's testimony corroborated many of the incriminating statements attributed to Mayhue on the tape and transcript.

Mayhue testified in his own defense, denying that he had ever had sexual contact with any of the young girls. He attempted to discredit the State's witnesses by showing they had motives to lie and that they lied in response to improper police questioning.

The jury found Mayhue guilty of aggravated sexual assault of J.M. and sexual assault of M.S. The court sentenced Mayhue in accordance with the jury's assessment of punishment.

Mayhue appeals in three points of error. First, he contends he did not have effective assistance of counsel at trial. Second, he argues the trial court erred in allowing the State to publish to the jury as an aid a transcript of Mayhue's taped conversation with Lemay. Third, Mayhue contends the evidence is factually insufficient to support his conviction for aggravated sexual assault of J.M.

## DISCUSSION

### *Transcript of Audio Tape as Jury Aid*

■ We first discuss point of error two, concerning the propriety of publishing the transcript of the audio tape to the jury, because the contents of the tape are important to our resolution of Mayhue's other two points of error.

The court of criminal appeals has held that the jury may use an authenticated transcript as an aid while listening to an audio tape. *Garrett v. State,* 658 S.W.2d 592, 594 (Tex. Crim.App.1983); *see also Garner v. State,* 939 S.W.2d 802, 807 (Tex.App.—Fort Worth 1997, pet. ref'd) ("Counsel . . . is permitted to use jury aids which are not admitted into evidence. Their purpose is merely to assist the jury in understanding the evidence actually introduced.")

Before trial, the State notified the court that it intended to offer the tape of Mayhue's conversation with Lemay in evidence. The State also revealed it wanted to produce an unofficial transcript to the jury to use as an aid while they listened to the tape. Mayhue objected to publication of the State's transcript, arguing it was "rife with error" and that the jury might seize on the erroneous written words rather than the audible words on the tape. Mayhue did not argue the tape was inaudible or incapable of being deciphered. Nor did he point out specific discrepancies between the tape and the transcript, or provide a transcript of his own, even though he had access to the tape and the State's transcript before trial. Lemay testified that he taped the conversation between himself and Mayhue and then helped an employee of the district attorney's office transcribe the tape into written form.

The court listened to the tape and read the State's transcript. The court then overruled Mayhue's objection. The court indicated it would allow the jury to use the transcript while they listened to the tape but would not allow them to take the transcript to the jury room for deliberations. The court allowed the State to play the tape and publish the transcript, but first gave the following instruction to the jury:

Ladies and gentlemen of the jury, before you start reading those and before we start listening to the tape, let me explain and make sure we're all clear.

What you have in your hands is simply an aid for you to try to help you in understanding the tape. It's not evidence in and of itself. It was not done by experts. It was done to try to aid people in listening to the tape because of the background noises. If you hear something differently than what you have in your hand, then you rely on what you hear as being the evidence because the evidence is the tape, not this; and this will not be allowed to go with you back into the jury room. It's simply here hopefully to help you hear the tape, and you will have the tape with you back in the jury room, but you won't have this particular written aid.

Mayhue's contention on appeal is not the same as his contention at trial. At trial, he did not argue the tape was inaudible. Instead, he treated the taped conversation as largely decipherable and argued the transcript did not accurately mirror the taped statements. He now characterizes the tape as "virtually incomprehensible, making a transcript necessary as opposed to just useful." Mayhue did not assert the particular complaint he raises on appeal. *See* Tex. R.App. P. 52(a); *e.g., Martinez v. State,* 867 S.W.2d 30, 35 (Tex.Crim.App.1993) (point of error must correspond with objection made at trial).

In any event, we disagree with both Mayhue's arguments at trial and on appeal. We have reviewed the tape. Much of the taped conversation, including incriminating statements made by Mayhue, is decipherable without the transcript. Parts of the taped conversation are completely inaudible because of background noise, and the transcript reads "inaudible" where it corresponds with those parts. Other parts of the taped conversation are audible but difficult to decipher without rewinding the tape and repeatedly playing it. The sounds on the tape correspond with the written words on the transcript in those parts. The transcript merely eliminates the need to repeatedly replay those parts of the tape. It aided the jury in understanding the taped conversation and did not serve as a suggestive substitute for inaudible or indecipherable conversation.

Furthermore, we do not observe any *material* differences between the taped conversation and the transcript. Mayhue did not point out *any* specific discrepancies between the tape and transcript at trial. Nor does he on appeal. We also note that Mayhue testified at trial and thus had an opportunity to explain what he thought the recorded conversation was. He did not deny the accuracy of the State's transcript. Instead, he admitted he made the incriminating statements but explained that he had been lying when he made them. We hold that the trial court did not err in allowing the jury to read the unofficial transcript while they listened to the tape recording.[3] We therefore overrule Mayhue's second point of error.[4]

---

**3.** Mayhue recognizes the authority of *Garrett* and *Garner,* but attempts to analogize his situation to that in *Leal v. State,* 782 S.W.2d 844 (Tex.Crim. App.1989), where the court disapproved the publication of an unsworn translation of a Spanish tape into an English transcript. *Leal* is inapposite. The court's basis for its ruling was that the trial court did not comply with article 38.30 of the Code of Criminal Procedure in producing the *translation.*

**4.** We also observe that federal courts have considered this issue on several occasions. *See, e.g., United States v. Polk,* 56 F.3d 613, 631–32 (5th Cir.1995); *United States v. Wilson,* 578 F.2d 67, 69–71 (5th Cir.1978); *United States v. Onori,* 535 F.2d 938, 946–49 (5th Cir.1976). In *Onori,* the Fifth Circuit held an authenticated transcript of a tape recording is admissible for the limited purpose of aiding the jury while they listen to the recording. *Onori,* 535 F.2d at 946–49; *see also Wilson,* 578 F.2d at 69. The court explained that such transcripts are useful both to identify the speakers and to understand portions of the tape that are difficult to hear. *Onori,* 535 F.2d at 947. The court then suggested a procedure by which trial courts should accommodate parties who disagree about the accuracy of a given transcript: the trial court and the parties should first endeavor to produce a stipulated transcript that satisfies both sides; if those efforts fail, each side should prepare its own transcript and produce evidence both supporting its version and challenging the accuracy of that produced by the other side. *Onori,* 535 F.2d at 948–49, *cited* in *Wilson,* 578 F.2d at 70. Because the jury as factfinder must ultimately reconcile discrepancies between the transcripts and recording, the trial court need not decide whether a transcript is accurate before the jury reviews a transcript along with the tape. *Onori,* 535 F.2d at 948, *cited in Wilson,* 578 F.2d at 70. The instructions to the jury in *Onori* were similar to those given by the trial court here. *See Onori,* 535 F.2d at 946. We find *Onori* and its progeny to be consis-

*Sufficiency of Evidence of Aggravated Sexual Assault*

In his third point of error, Mayhue contends the evidence is factually insufficient to support his conviction for aggravated sexual assault of J.M. When reviewing a challenge to the factual sufficiency of the evidence, we view all the evidence objectively and set aside the verdict only if it is so against the weight of the evidence as to be clearly unjust. *Cain v. State*, 958 S.W.2d 404, 407–08 (Tex.Crim.App.1997) (citing *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim. App.1996)).

A person commits the offense of aggravated sexual assault if he intentionally or knowingly causes his penis to penetrate the mouth of a child younger than fourteen years of age. Tex. Penal Code Ann. 22.021(a)(1)(B)(ii), (2)(B).

The State presented several witnesses whose testimony suggests Mayhue was guilty of committing aggravated sexual assault against J.M. For example, J.M.'s boyfriend testified J.M. told him and her mother that Mayhue had committed the offense. According to the boyfriend, J.M. told him during the summer of 1995 that her "dad" (indicating Mayhue) "made her suck his penis," and that if she practiced and became good at it, men would appreciate it. She further told him that Mayhue had told her he would not ask her to do it anymore "after she turned thirteen." However, according to J.M.'s boyfriend, she said the activity continued after her thirteenth birthday. At her boyfriend's urging, J.M. told her mother about the abuse the same day she told him. The boyfriend purportedly heard the conversation between J.M. and her mother and at one point, heard J.M. say Mayhue would "kill her" if she ever told anyone. J.M.'s boyfriend also testified he overheard J.M. tell her mother the abuse had been occurring since she was about seven years old. J.M.'s mother admitted in her testimony that J.M. once told her Mayhue had been "messing with her." Furthermore, Mary Ryle testified that although J.M. initially denied having any sexual contact with

Mayhue, upon further questioning J.M. admitted that Mayhue had had oral sex with her in the past. J.M. herself confirmed she made those statements to her mother and the officer.

Most importantly, the State presented the recorded conversation between Mayhue and Lemay as well as Lemay's testimony recounting the conversation. The tape reveals that Lemay strongly warned Mayhue of the gravity of the allegations and investigation. Despite these warnings, Mayhue volunteered information tending to incriminate himself. After Lemay stated that he had evidence of the offense and urged Mayhue to explain his side of the story, Mayhue volunteered that he "needed help" because he "wanted to stop." He offered several explanations for his behavior. For instance, after Lemay asked Mayhue why he abused M.S. and J.M., Mayhue said he had had cancer since he was a child and, therefore, he had been "robbed of his youth." He explained that he was "hurt" when his girlfriends made derogatory comments about the size of his penis. Finally, Mayhue offered that he had been sexually abused himself when he was a child.

Later in the conversation, Lemay admitted he was recording the conversation. Lemay continued to question Mayhue about J.M.'s allegations that she had fellated Mayhue. Knowing he was being recorded, Mayhue indicated the abuse occurred about "once a month." He continued to explain that J.M. would "do it" to get out of trouble, to get off restriction, and to gain permission to see her boyfriend. When Lemay asked Mayhue if he got an erection with J.M., Mayhue responded "somewhat." When Lemay asked Mayhue whether he had the contact with J.M. for a sexual release, Mayhue responded that he did not want a release—he wanted "control."

Lemay also testified that despite Mayhue's agreement to go to the police station after the conversation, Mayhue fled. Evidence of flight can circumstantially support an inference of guilt. *E.g., Bigby v. State*, 892 S.W.2d 864, 884 (Tex.Crim.App.

tent with *Garrett* and *Garner* and reiterate that at no point during the trial did Mayhue produce a

transcript he deemed to be accurate.

1994); *Foster v. State,* 779 S.W.2d 845, 859 (Tex.Crim.App.1989).

The defense offered several explanations for the above-detailed evidence. Mayhue attempted to establish that he, J.M., and her boyfriend had motives to lie or lied as a result of inappropriate police questioning. Mayhue attempted to discredit J.M's boyfriend's testimony by pointing out that the boyfriend himself was guilty of having illegal sexual contact with J.M. According to Mayhue, the boyfriend cooperated with the police in exchange for immunity from prosecution. The record contains a letter the boyfriend sent to the district attorney's office months before trial, attempting to withdraw the statements he originally made to investigators. The State later granted J.M.'s boyfriend immunity from prosecution and he fully cooperated with the State at trial. He testified at trial that the State had granted him immunity.

Mayhue also relied upon the fact that J.M. recanted her accusations after her initial meeting with police. J.M. testified at trial that she initially told her mother Mayhue had been "messing with her" because her mother had caught her and her boyfriend having sex. According to J.M., she made these "false" allegations so that her mother would no longer be angry with her for having sex with her boyfriend. According to both J.M. and her mother, J.M. recanted her story when her mother threatened to confront Mayhue with the allegations. J.M. further testified at trial that she told the police Mayhue had molested her only because they called her a liar when she initially denied the allegations. According to J.M., she lied to the police and made up details about the alleged sexual contact so that she would sound believable. After Mayhue's arrest and throughout trial, J.M. steadfastly maintained that Mayhue never touched her sexually. She so testified despite her acknowledgment of Mayhue's tape-recorded statements.

Mayhue attempted to discredit his own tape-recorded statements by testifying that he was extremely scared when the officer approached him for a conversation. According to Mayhue, he incriminated himself to "calm" the officer down.

The State presented evidence to explain J.M.'s recantation. The State elicited testimony from several witnesses that supports the inference that J.M. might have preferred to live with her father because the accommodations were more comfortable and because he gave her more "privileges." Furthermore, one of the letters J.M. wrote to the district attorney's office after Mayhue's arrest supports the inference that J.M. recanted because she did not want to be the reason her "dad" (Mayhue) would not be home for Christmas. There is also evidence in the record that J.M.'s mother had financial trouble and often had to rely on Mayhue's mother to house and support herself and her family. This suggests J.M. had a motive to protect Mayhue despite his guilt. In other words, the evidence shows J.M. might have been in the unenviable position of choosing between (1) protecting her "father" despite his guilt and (2) accusing him of molesting her, but consequently risking loss of *both* her preferred, stable home with him and her fallback home with her mother and paternal grandmother. We also note the evidence suggesting Mayhue threatened J.M. not to tell anyone he abused her.

Based on an objective evaluation of the evidence detailed above, we hold the evidence is factually sufficient to support the determination that Mayhue is guilty of aggravated sexual assault of J.M. We reiterate that the most compelling evidence came not from the hearsay statements of third parties, but from the *defendant himself and the actions he took* upon accusation. We overrule point of error three.

### Effectiveness of Counsel

In his final point of error, Mayhue alleges he did not have effective assistance of counsel at the guilt stage of trial. Mayhue contends his counsel was ineffective because he:

- failed to object to extraneous offense evidence alleging that Mayhue had sexual intercourse with S.N., a thirteen-year-old girl, and that he smoked marihuana with her and drank alcoholic beverages with her;

- failed to object to many hearsay statements of M.S., her boyfriend, J.M.'s boyfriend, and two police officers;
- failed to object to J.M.'s boyfriend's extraneous offense testimony implying that Mayhue threatened him for cooperating with the prosecution;
- failed to object to extraneous offense testimony alleging Mayhue fondled M.S. (an incident not charged in the State's case concerning M.S.);
- failed to object to extraneous offense testimony alleging Mayhue had been sexually abusing J.M. for several years (conduct not charged in the State's case concerning J.M.);
- left a second-chair attorney in charge for one afternoon of trial because lead counsel was scheduled to appear in federal court for a bankruptcy proceeding;
- failed to conduct a meaningful voir dire;
- failed to object to an allegedly erroneous limiting instruction in the jury charge concerning the use of extraneous offense evidence; and
- failed to seek an instruction limiting the jury's consideration of evidence admitted to impeach J.M.

We measure claims of ineffective assistance of counsel against the standard set forth by the Supreme Court of the United States in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the court of criminal appeals in *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex.Crim.App.1986).[5] In *Strickland*, the court set forth a two-element standard that requires the defendant to show both that his counsel made serious errors and that those errors caused serious harm:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This

requires showing that counsel's errors were so serious as to deprive the defendant of fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

In determining whether an appellant has satisfied the first element of the test, we decide whether the record establishes that counsel failed to provide reasonably effective assistance. *See Strickland*, 466 U.S. at 687–88, 104 S.Ct. 2052; *Hernandez*, 726 S.W.2d at 55; *Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex.Crim.App.1986). The appellant must demonstrate that counsel's performance was unreasonable under the prevailing professional norms and that the challenged action was not sound trial strategy. *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052; *Stafford v. State*, 813 S.W.2d 503, 506 (Tex.Crim.App.1991). We do not evaluate the effectiveness of counsel in hindsight, but from counsel's perspective at trial. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052; *Ex Parte Kunkle*, 852 S.W.2d 499, 505 (Tex. Crim.App.1993); *Stafford*, 813 S.W.2d at 506. We assess the totality of the representation, rather than isolated acts or omissions. *E.g., Wilkerson*, 726 S.W.2d at 548. The court of criminal appeals has explained that we presume defense counsel provides reasonable professional assistance and the defendant must present proof to overcome this presumption:

Under the *Strickland* test, the defendant bears the burden of proving ineffective assistance. In addition, when reviewing a claim of ineffective assistance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"

*Jackson*, 877 S.W.2d at 771 (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052); *Hernandez*, 726 S.W.2d at 55; *O'Hara v. State*, 837 S.W.2d 139, 143 (Tex.App.—Austin 1992, pet. ref'd). The standard of proof for ineffec-

---

**5.** The court of criminal appeals first used this test in *Butler v. State*, 716 S.W.2d 48, 54 (Tex. Crim.App.1986); *see also Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex.Crim.App.1986); *Jackson v. State*, 877 S.W.2d 768, 771 (Tex.Crim.App. 1994).

tiveness of counsel is a preponderance of the evidence. *E.g., Moore v. State,* 694 S.W.2d 528, 531 (Tex.Crim.App.1985). This burden is not a light one:

> [i]n determining whether counsel's trial performance was deficient, judicial scrutiny must be highly deferential. A reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.

*Oestrick v. State,* 939 S.W.2d 232, 237 (Tex. App.—Austin 1997, pet. ref'd); *Bohnet v. State,* 938 S.W.2d 532, 536 (Tex.App.—Austin 1997, pet. ref'd) (citing *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052); *see also Jackson v. State,* 877 S.W.2d 768, 771 (Tex.Crim.App. 1994).

■ Generally, we will not speculate about trial counsel's trial strategy. *See Jackson,* 877 S.W.2d at 771; *Delrio v. State,* 840 S.W.2d 443 (Tex.Crim.App.1992).[6] An appellant, however, may rebut the presumption of effectiveness by providing a record from which we may determine that trial counsel's performance was not based on sound strategy. *See Jackson,* 877 S.W.2d at 771–72; *Bohnet,* 938 S.W.2d 532 at 536.

In this case, we have no record from which we may discern trial counsel's strategy. Mayhue did not file a motion for new trial and request a hearing at which he could have developed such a record. *See Reyes v. State,* 849 S.W.2d 812 (Tex.Crim.App.1993) (defendant may raise ineffective assistance of counsel claim and develop record in proceeding on motion for new trial).[7] Nothing in the trial record reveals counsel's trial strategy with regard to the above-enumerated acts and omissions that Mayhue alleges show the inef-

fectiveness of counsel's representation. In the absence of such a record, Mayhue cannot in this direct appeal overcome the strong presumption that his trial counsel's strategy was reasonable from counsel's perspective at trial. The record before us is insufficient to support such a conclusion. *See Jackson,* 877 S.W.2d at 771–72; *Bohnet,* 938 S.W.2d at 536; *Oestrick,* 939 S.W.2d at 237–38.

■ Moreover, Mayhue has not satisfied the second element of the test. Mayhue must prove a reasonable probability that his counsel's alleged errors caused a different result. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *Hernandez,* 726 S.W.2d at 55. A reasonable probability is a likelihood sufficient to undermine confidence in the outcome. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *Hernandez,* 726 S.W.2d at 55. We first note that the jury properly had before it Mayhue's taperecorded admissions to having illegal sexual contact with both M.S. and J.M.,[8] as well as Lemay's testimony regarding his conversation with Mayhue. Second, we note that the trial court instructed the jury, in the charge, as follows:

> Evidence has been introduced in this case regarding the defendant's having committed offenses other than the offense now alleged against him. You cannot consider this testimony for any purpose unless you believe beyond a reasonable doubt that the defendant committed such other offenses, if any. Even then you may only consider the same in determining the identity of the defendant, or the issues of intent, motive, system, scheme, or design, in connection with this offense, and for no other purpose.

*See* Tex.R. Evid. 404(b). Based on this record, which includes direct evidence of May-

---

6. Although the court of criminal appeals did speculate about trial counsel's strategy in *Delrio v. State,* 840 S.W.2d 443, 446–47 (Tex.Crim.App. 1992), the fruit of the court's speculation was not material to the court's determination of whether trial counsel was ineffective. *See id.; see also Jackson,* 877 S.W.2d at 771.

7. A defendant may also develop such a record in the context of a hearing held in relation to an application for writ of habeas corpus. *See Jackson,* 877 S.W.2d at 772, 772 n. 2 (Baird, J., concurring).

8. We have already detailed Mayhue's comments regarding the offense alleged against J.M. Mayhue also made comments regarding the offense alleged against M.S. When confronted with the allegation that he had had intercourse with M.S., Mayhue denied having intercourse "because [he] couldn't even get hard with" her, but he admitted fondling her. When later asked if M.S. objected to having intercourse, Mayhue responded that "she did it on her own free will," he knew what he was doing was wrong, and that she did not mind and was "gettin' it from everybody else."

hue incriminating himself and the above instruction limiting the jury's consideration of extraneous offense evidence, we cannot say any errors made by trial counsel probably caused the rendition of an improper verdict. Accordingly, we overrule Mayhue's point of error one.

## CONCLUSION

We have concluded that the trial court properly allowed the jury to reference a transcript of the audio taped conversation between Mayhue and Lemay, the evidence is factually sufficient to support the conviction for aggravated sexual assault, and Mayhue failed to establish his counsel was ineffective at trial. Having so concluded, we affirm the convictions.