# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00194-CR

**Douglas Warren, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 403RD JUDICIAL DISTRICT
### NO. 3012146, HONORABLE BRENDA KENNEDY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Douglas Warren appeals his convictions for aggravated sexual assault of a child, indecency with a child by contact, and indecency with a child by exposure. *See* Tex. Pen. Code Ann. § 21.11 (West 2003), § 22.021(a)(1)(B)(ii) (West Supp. 2005). Warren contends in four issues that (1) the trial court erred by designating the CPS worker, rather than the victim's mother, as the outcry witness, and (2) his counsel provided ineffective assistance by failing to file a sworn motion for probation, (3) by failing to present mitigating evidence, and (4) by generally rendering legal services below a reasonable standard. We will overrule these contentions, but we will nevertheless reverse the indecency convictions because they violate the constitutional guarantee against double jeopardy.

## BACKGROUND

Warren was accused of molesting his seven-year-old niece, A.W., on or about August 10, 2000. A jury trial was conducted in November 2003. Warren pled "not guilty" to all three counts and, in "sticking to his not guilty" plea, Warren "instructed" his counsel to not negotiate a plea bargain with the State. Similarly, no motion for probation was filed. During voir dire, Warren's counsel told the potential jurors, "let me make this very, very clear. . . . Douglas Warren is not asking you for probation. That is not what this trial is about. Douglas Warren is asking you to find him not guilty." Counsel went on to explain to the panel that, although Warren was eligible for probation due to his lack of prior felony convictions, "we have not filed that application for probation. Why? [Because] he is asking to be found not guilty." Warren subsequently confirmed that this was his personal decision.

The State called A.W., who was ten years old at the time of trial, as its first witness. A.W. began by testifying about her family structure. She explained that her parents were divorced and that she lived primarily with her mother and stepfather but also had extended periods of visitation with her father and stepmother. Frequently, those visits would occur at her paternal grandparents' residence; they owned property on which a main house and several mobile homes were located. Many members of A.W.'s father's family resided there, including Warren, an aunt (Brenda) and her son, and another uncle (Mark), along with his wife and their three children.

Next, A.W. testified about an incident that occurred between her and a male classmate, Andy, when she was in kindergarten. She said that, one day on the playground, "[h]e asked me to put my mouth on his private." A.W. told her mother what happened and, as indicated

2

by the other witnesses' testimony, the Warren family members were all aware of this incident. A.W. was thereafter placed in a different class, and no further events with Andy were alleged.

A.W. then testified about the allegations against Warren. She explained that the incident occurred one night during a visitation period at her grandparents' property. She knew it was shortly before her grandmother passed away, making it sometime in August 2000. A.W. was sleeping in the living room of the main house on a couch that she remembered was "orange," wearing a nightgown that "had purple sleeves with a little girl on it." She testified that Warren was sleeping on a mattress on the floor and, after everyone else had gone to bed, he asked her about what she had done with Andy. A.W. testified that "[h]e asked me to show him how," then "[h]e got on his knees" in front of her and "took his private out of his shorts," and "I stuck my mouth on his private." She testified that they stopped because her father entered the room.[1] A.W. demonstrated this incident with two anatomically correct dolls.[2]

A.W. testified that she first talked to her mother about this incident and that her mother "just started crying." A.W. agreed that CPS investigator Linda Berrera was "the first adult that [she] really talked to in detail about what happened with [Warren]."

---

[1] A.W.'s father did not testify.

[2] A.W. also testified about a second incident with Warren, which occurred on a later date in a mobile home on her grandparents' property. She testified that Warren unzipped his pants, and had her unbutton her shorts and sit on his lap, straddling him and facing him, with his hands on her bottom. When someone knocked on the door, they stopped. Warren told A.W. "[n]ot to talk about it." A.W. testified that both she and Warren were wearing underwear and that his penis was not exposed. Warren's conduct on this occasion, as described by A.W., did not constitute either sexual assault or sexual contact.

3

The State called A.W.'s mother, Angela, as its second witness. Before Angela took the stand, the prosecutor said, "I am not offering the mom as the outcry witness. . . . But I know [defense counsel] thought she was, so I wanted to bring it [up]." Upon Warren's challenge, the trial court conducted a hearing outside the jury's presence to determine whether Angela should be designated as the outcry witness. During the hearing, Angela testified that she asked A.W. if anyone had "messed with her sexually," and A.W. responded "yes." Angela then named several of A.W.'s male relatives, and A.W. responded "no" to each name. The last name Angela questioned was "Douglas [Warren]." Although A.W. initially said "no," she put her head down and appeared upset when she answered, prompting Angela to repeat appellant's name. At that point, A.W. said "yes" and told her mother that Warren had asked her to perform the act that she did with Andy at school. Without providing her mother any further details or confirming whether she and Warren had actually engaged in this act, the discussion between A.W. and Angela ended, and they both cried.

At the conclusion of this hearing, Warren's counsel re-urged that Angela was the proper outcry witness but acquiesced that he had no authority beyond "the plain language of article 38.072(2)" to support his position. *See* Tex. Code Crim. Proc. Ann. art. 38.072, § 2 (West 2005) (permitting hearsay testimony by first adult to whom child made statement about offense). The court recessed to consider the issue and ultimately ruled that Angela was not the outcry witness. At that time, the court also stated that "there is no objection from the defense as to whether or not this witness was the outcry witness." The record does not reflect what occurred during the recess to result in the court's statement that there was no live objection by Warren as to the outcry witness, but Warren did not challenge the court's statement.

4

The State proceeded to call Angela, who testified generally about her discussion with A.W. Before beginning his cross-examination, Warren approached the bench and requested that he be permitted to question Angela about the specifics of A.W.'s responses. The State had no objection "as long as he is not attempting to confuse who the true outcry witness is," and the court confirmed that the issue had already been ruled on. Warren then elicited Angela's testimony about what A.W. told her, just as she had previously testified outside the jury's presence.

Next, the State called CPS worker Linda Berrera, who testified that A.W. "opened up" and "let it all out" when discussing the August 10 incident. As Berrera began to testify about the details of A.W.'s outcry, Warren objected that her testimony violated article 38.072 and his due process rights. *See id.* The court overruled his objection, and Berrera's testimony continued. She averred that A.W. told her that "she had taken his thingy and sucked on it," and that Warren had told her to keep it a secret. Berrera testified that A.W. said this had occurred during the evening one weekend when she was visiting her father at her grandparents' property.

Finally, the State called Warren's brother, Mark, who testified that Warren confided in him that "he was asleep and he woke up, and [A.W.] was fondling with him. . . . He didn't go into any detail . . . but he did tell me that something did happen." On cross-examination, Warren's counsel challenged the credibility of Mark's testimony by having him admit that, (1) even though Warren allegedly made this statement over two years ago, and Warren's counsel had previously questioned Mark on this specific issue, Mark did not tell anyone about the conversation until "yesterday," when he mentioned it to the prosecutor, and (2) despite Warren's statement, Mark permitted Warren to be around his three children under circumstances that were "[j]ust normal,

5

everyday Uncle Dougie."  Warren's counsel also asked Mark whether he had "been taking anything that might affect your memory," and Mark responded, "I smoke weed."

Other members of the Warren family testified during Warren's defense.  Warren's counsel elicited testimony from Brenda, appellant's sister, that Warren never had the opportunity to molest A.W. because he was not alone with her long enough to do so.  A.W.'s grandfather corroborated this by testifying that Warren was only around A.W. "[d]uring the daytime hours [] when everybody was around."  Finally, Georgiana Brown, a close family friend, testified that Warren was "a truthful person."

Warren also testified.  He claimed that the allegations were untrue and that A.W. acted affectionately toward him because she had a crush on him.  Warren testified that, when A.W. was approximately three years old, she showed him affection by "sitting on my lap, rubbing back and forth on me."  Warren said he never told anyone in his family about this incident but acknowledged, "yes, I should have."

In his closing argument at the guilt/innocence phase, Warren's counsel emphasized the witnesses' testimony that Warren was truthful and had a lack of opportunity to molest A.W., and he argued that Angela's testimony was not credible because she had questioned A.W. in a leading fashion.  Warren's counsel also attacked the credibility of Mark's testimony, saying that "the fact that he might be fixing to go to jail" would provide him a motive to "make this story up" and "testify for the State."  Further, he challenged Mark's failure to tell anyone about Warren's alleged confession and noted that Mark allowed Warren to be around his children thereafter.  Finally,

defense counsel re-urged Warren's innocence and discussed the meaning of "reasonable doubt" and the importance of the jury's decision.

The jury returned its verdict, finding Warren guilty on all three counts. Before proceeding to punishment, the trial court confirmed with Warren that it had been his decision "from the very beginning of the trial" to not seek probation. Warren conceded this but requested to do so at that time. The court explained that it was now the State's decision, and the prosecutor responded, "I don't believe it would be appropriate at this time" because "it was clear that [it] was a strategy decision between [defense counsel] and his client." The parties then agreed that no new evidence would be presented during the punishment phase, waived opening statements, and proceeded directly to closing arguments.

Warren's counsel argued that, in deciding the proper punishment, the jury should consider that Warren had no criminal history, that he had a supportive family who testified to his innocence, and that the evidence indicated this was "not forceful conduct." Contrary to the State's argument that Warren's punishment should be equivalent to the lifetime for which A.W. will be impacted by this offense, the defense suggested the statutory minimum of five years' confinement. *See* Tex. Pen. Code Ann. § 12.32 (West 2003), § 22.021(e) (West 2003 & Supp. 2005).

The jury sentenced Warren to nine years on Count One, two years on Count Two, and two years on Count Three, to run concurrently. The trial court entered judgment in accordance with the jury's verdict. This appeal followed.

**ANALYSIS**

Warren asks this Court to reverse his conviction because the trial court improperly designated CPS worker Berrera as the outcry witness and because his counsel provided ineffective assistance by failing to (a) file an application for probation, (b) present mitigating evidence, and (c) generally provide service at the required professional standard.

**Outcry Witness**

Although hearsay statements are generally inadmissible, they may be admitted in specific situations when public policy supports their use and circumstances demonstrate their reliability. *Martinez v. State*, 178 S.W.3d 806, 810 (Tex. Crim. App. 2005). Article 38.072 delineates such a situation. Pursuant to article 38.072, in a case alleging that sexual assault or a sexual offense was committed against a child under the age of thirteen, an exception to the hearsay rule exists to allow testimony by the first adult, other than the defendant, "to whom the child made a statement about the offense." Tex. Code Crim. Proc. Ann. art. 38.072; *Martinez*, 178 S.W.3d at 810-11 & n.13-15 (discussing policy basis of exception). This adult is designated as the "outcry witness." *Jones v. State*, 92 S.W.3d 619, 621 (Tex. App.—Austin 2002, no pet.). Generally speaking, the exception is available for only one witness, unless the child revealed discrete occurrences of the same offense, or revealed different offenses, to separate adults. *Broderick v. State*, 35 S.W.3d 67, 73 (Tex. App.—Texarkana 2000, pet. ref'd); *Hernandez v. State*, 973 S.W.2d 787, 789 (Tex. App.—Austin 1998, pet. ref'd).

Although the statute provides simply that the proper outcry witness is the "first" adult to whom a child made a statement about the offense, this provision has been interpreted to mean the

8

first adult to whom the child "in some discernible manner describes the offense." *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990); *Jones*, 92 S.W.3d at 621. A general allegation of abuse is not enough. *Garcia*, 792 S.W.2d at 91 (statement must provide more than "general allusion" of abuse).

In several cases where the child has first made a general statement to one adult, followed by a more detailed recount of the offense to a second adult, courts have considered the issue of which witness should be permitted to testify as the outcry witness about the child's statements. *See*, *e.g.*, *Foreman v. State*, 995 S.W.2d 854, 858 (Tex. App.—Austin 1999, pet. ref'd) (listing similar cases). In such cases, if the initial statement conveyed nothing more than a "general allusion" of abuse, then the recipient of a subsequent, detailed statement should be designated as the outcry witness, even though that person was, technically, not the first adult to whom the child revealed the offense. *See*, *e.g.*, *Garcia*, 792 S.W.2d at 91 (initial statement "that something happened at home, and that it had to do with abuse" was "general allusion," insufficient to designate first adult as outcry witness).[3] Nevertheless, courts should not determine the proper outcry witness "by comparing the

---

[3] *See also Yebio v. State*, 87 S.W.3d 193, 198 (Tex. App.—Texarkana 2002, pet. ref'd) (initial statement that "did not get into intimate details" insufficient to designate as outcry, but subsequent statement conveying details of offense was sufficient); *Castelan v. State*, 54 S.W.3d 469, 475-76 (Tex. App.—Corpus Christi 2001, no pet.) (telling grandmother only that defendant "put his thing in through the back" was insufficient to designate her as outcry witness, where child subsequently gave statement to counselor "in great detail"); *Foreman v. State*, 995 S.W.2d 854, 858-59 (Tex. App.—Austin 1999, pet. ref'd) (second adult, to whom specific account was given, was proper outcry witness where first adult could not remember child's statement due to drug use); *Schuster v. State*, 852 S.W.2d 766, 768 (Tex. App.—Fort Worth 1993, pet. ref'd) (initial statement to mother that appellant "had touched her" was a "general allusion" and subsequent, detailed statement to psychologist was sufficient outcry); *Torres v. State*, 2000 Tex. App. LEXIS 4927, at *7 (Tex. App.—Austin July 27, 2000, no pet.) (not designated for publication) (child's acknowledgment that defendant had "hurt her or touched her in the privates" only "alluded to sexual abuse rather than

9

statements the child gave to different individuals and then deciding which person received the most detailed statement about the offense." *Broderick*, 35 S.W.3d at 73.

A trial court has broad discretion in determining the admissibility of evidence, and its decisions on such matters will be upheld absent a clear abuse of discretion. *Garcia*, 792 S.W.2d at 92. An abuse of discretion will not be found unless the court's decision was outside the zone of reasonable disagreement. *West v. State*, 121 S.W.3d 95, 100 (Tex. App.—Fort Worth 2003, pet. ref'd). We must uphold the evidentiary ruling as long as it is reasonably supported by the record and is correct under any theory of applicable law. *Id.*[4]

Here, A.W. testified that she initially told her mother that Warren had asked her to perform the act she did with Andy at school, but her mother just cried, and no further details were discussed. Angela's testimony corroborated this. She testified that she asked A.W. if anyone had "messed with her sexually" and if it was "Douglas," and A.W. responded "yes" and conveyed what Warren had requested. A.W.'s statement to her mother did not confirm that she had actually performed the act Warren requested, much less did it provide any details about how the offense occurred or about when, where, and how many times such an incident had occurred between them. On this record, we hold that the trial court' s determination that A.W. conveyed only a "general

---

explaining in any discernible manner the alleged offense and how, when, and where appellant touched her"; subsequent statement that provided such details was child's "outcry").

[4] The State contends that Warren waived the outcry issue based on his silence when the trial court announced that "there is no objection from the defense as to whether or not this witness was the outcry witness." We reach the merits, however, because Warren later re-urged his objection during Berrera's testimony, claiming it violated article 38.072 and his due process rights, and he obtained an adverse ruling. *See* Tex. R. App. P. 33.1; *Rosas v. State*, 76 S.W.3d 771, 776-77 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

10

allusion" of abuse to her mother was within the zone of reasonable disagreement. *See id.*; *Monreal v. State*, 2006 Tex. App. LEXIS 773, at *25-26 (Tex. App.—Houston [14th Dist.] Jan. 31, 2006, no pet. h.) (mem. op.) (initial allegation was "general allusion" where it provided no information about "time, place, and circumstances surrounding the abuse"). The record also demonstrates that A.W. first described the offense in a discernible manner to Berrera. Hence, the trial court did not abuse its discretion in concluding that Berrera was the proper outcry witness. *Garcia*, 792 S.W.2d at 91.

Further, this case does not present a scenario in which the trial court erred by permitting outcry testimony from multiple witnesses. *See Hernandez*, 973 S.W.2d at 789. The State confined its examination of Angela to what she asked A.W., and Warren voluntarily elicited her testimony about A.W.'s responses after he was aware of the trial court's ruling that Berrera was the proper outcry witness. And, before Warren elicited Angela's testimony, he was warned that he should not do so in an "attempt[] to confuse who the true outcry witness is" because that issue had already been ruled on. Consequently, Warren's complaint that Berrera's testimony was inadmissible "bolstering" in violation of his due process rights is without merit. *See Briggs v. State*, 789 S.W.2d 918, 923-24 (Tex. Crim. App. 1990). Warren's first issue is overruled.

**Ineffective Assistance**

Warren's second, third, and fourth issues challenge his conviction on the ground that he was denied his Sixth Amendment right to effective assistance of counsel. The standard announced in *Strickland v. Washington*, 466 U.S. 668, 694 (1984)*,* governs whether Warren satisfied his burden to prove that his counsel's assistance was ineffective. *See Hernandez v. State*, 988 S.W.2d 770, 770 (Tex. Crim. App. 1999) (*Strickland* applies to alleged ineffectiveness at

11

punishment as well as guilt/innocence; overruling *Ex parte Duffy*, 607 S.W.2d 507, 516 (Tex. Crim. App. 1980)). Pursuant to *Strickland*, Warren must demonstrate that (1) his counsel's performance was deficient, *i.e.*, it fell below an objective standard of reasonableness, and (2) Warren was prejudiced because a reasonable probability exists that, but for the deficient performance, the outcome of his trial would have been different. 466 U.S. at 687-88, 694; *Ex parte Cash*, 178 S.W.3d 816, 818 (Tex. Crim. App. 2005).

We review counsel's representation in its totality, rather than as isolated acts or omissions, and we evaluate the performance from counsel's perspective at trial, rather than in hindsight. *Stafford v. State*, 813 S.W.2d 503, 506 (Tex. Crim. App. 1991); *Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex. Crim. App. 1986). Further, we indulge a strong presumption that counsel's acts and omissions were reasonable and part of a sound trial strategy, and it is the appellant's burden to overcome that presumption with a preponderance of the evidence. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994); *Moore v. State*, 694 S.W.2d 528, 531 (Tex. Crim. App. 1985). Our review is highly deferential to counsel, and we will not speculate about counsel's trial strategy. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002); *Mayhue v. State*, 969 S.W.2d 503, 511 (Tex. App.—Austin 1998, no pet.) (citing *Jackson*, 877 S.W.2d at 771). The appellant, however, may prevail by providing a record that affirmatively demonstrates counsel's performance was not based on sound strategy. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001); *Mayhue*, 969 S.W.2d at 511. If the appellate record is silent regarding the reasons for counsel's conduct—as it is in most cases—then it is insufficient to overcome the presumption that counsel followed a

legitimate strategy. *Tong v. State*, 25 S.W.3d 707, 714 (Tex. Crim. App. 2000); *Thompson v. State*, 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999).

### *Failure to File Sworn Motion for Probation*

Warren contends in his second issue that he was denied effective assistance of counsel due to his attorney's failure to file a motion for probation, thereby depriving the jury of the option to recommend probation. *See* Tex. Code Crim. Proc. Ann. art. 42.12, § 3(a) (West 1979) (upon defendant's filing of sworn motion demonstrating that he is eligible for probation because he has no prior felony convictions, jury may recommend probation if sentencing defendant to less than ten years).[5]

To show that counsel's failure to file a motion for probation constituted ineffective assistance, the appellant must establish that (1) he was eligible for probation, (2) counsel's decision was not part of a sound trial strategy, (3) the appellant's decision to not seek probation was based on counsel's erroneous advice, and (4) the appellant would have made a different decision if his counsel had correctly informed him of the law. *See State v. Recer*, 815 S.W.2d 730, 731-32 (Tex. Crim. App. 1991).[6]

---

[5] Probation is now termed "community supervision." *See* Tex. Code Crim. Proc. Ann. art. 42.12, § 4 (West Supp. 2005).

[6] Although *Recer* involves counsel's decision to elect the judge rather than the jury to assess punishment, we find it analogous because the underlying challenge is that counsel misunderstood the law on seeking probation. *See Pena-Mota v. State*, 986 S.W.2d 341, 348 (Tex. App.—Waco 1999, no pet.) (applying *Recer* to determine if counsel's encouragement to plead not guilty, rather than seek community supervision, was ineffective assistance).

Here, although it is undisputed that Warren was eligible for probation, Warren has not demonstrated the remaining three *Recer* elements. First, it appears that the attorney's decision to not file a probation motion was part of a trial strategy to unequivocally urge Warren's innocence. Starting at voir dire, Warren's counsel urged that Warren was "not asking you for probation" because he was "asking to be found not guilty." Counsel carried this strategy into his closing argument at guilt/innocence by urging, "Not guilty. That is the proper verdict." Also, Warren's counsel did not contest the prosecutor's statement that the decision to not file an application for probation had been a "strategy decision between [defense counsel] and his client" from the beginning of trial.

Second, the record demonstrates that Warren made a personal decision to not seek probation. Before sentencing, the trial judge asked, "Mr. Warren, you realize from the very beginning of the trial in this cause, you made the decision, and your attorney stated your decision at that time, not to file an application for probation in this case; is that correct?" Warren responded, "Yes your honor." Warren has not demonstrated that his decision was based on erroneous advice or that his decision would have been different but for such advice.[7] *See Jackson v. State*, 766 S.W.2d

---

[7] Warren states in his brief that "counsel must have felt there was a tactical reason for not filing a motion for probation." He asserts only that, despite such a strategy, "[o]ne can only imagine that Appellant was confused." His brief poses the questions "[i]s it possible that Appellant was [mis]led" and "[w]as Appellant under the [wrong] impression?" Warren concedes that "[t]here is no direct evidence to this effect," but claims the record "suggests" that counsel poorly informed him of the law. This is nothing but pure conjecture and speculation, which is not enough for a defendant to show that counsel was deficient or that his conduct had a prejudicial effect on the outcome of the proceeding. *Ex parte Cash*, 178 S.W.3d 816, 818-19 (Tex. Crim. App. 2005). Any allegation of ineffectiveness must be firmly rooted in the record. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

504, 509-11 (Tex. Crim. App. 1985); *Ramer v. State*, 714 S.W.2d 44, 47-48 (Tex. App.—Dallas 1986, pet. ref'd).

Because the decision to not file a sworn motion for probation was part of a trial strategy agreed to by Warren, and because Warren offered no proof that his counsel either misunderstood the law of probation or misinformed him about it, Warren has failed to prove by a preponderance of the evidence in this direct appeal either that his counsel's performance on this matter was deficient or that, but for this conduct, the outcome of his trial would likely have been more favorable. *See Strickland*, 466 U.S. at 688. Warren's second issue is overruled.

### *Presentation of Mitigating Evidence*

Warren contends in his third issue that he was deprived of effective assistance of counsel because his attorney failed to present mitigating evidence to the jury and failed to emphasize such evidence during his closing argument at the punishment phase. We disagree.

The record reflects that Warren's counsel repeatedly questioned witnesses about Warren's lack of opportunity to molest A.W., given that several family members were in close proximity when the abuse allegedly occurred and that precautions were taken so that Warren and A.W. were never alone.[8] Also, Warren's counsel called Warren's sister, father, girlfriend, and a close family friend to testify on Warren's behalf. Through these witnesses, Warren's counsel

---

[8] The Warren family claimed that, based on events such as the one with Andy at school, A.W. had demonstrated her "sexual nature." Thus, out of fear that Warren would be wrongly accused of abuse, his family made sure he was not alone with A.W. They admitted that similar precautions were not imposed for any other male members of the family but claimed that this was because Warren was the youngest male who was not married.

15

presented mitigating evidence relating to Warren's lack of opportunity, lack of motive, and good character. His counsel emphasized all of this evidence and challenged the credibility of the State's evidence during his closing argument at guilt/innocence. Then, during the closing of punishment, Warren's counsel explained that Warren had no criminal history, had a supportive family who believed in his innocence, and had not been "forceful" toward A.W. He urged the jury to take this mitigating evidence into consideration and sentence Warren to the statutory minimum of five years.

Although Warren's counsel did not present new evidence during the punishment phase, neither did the State, and the record is silent as to any reason for this. We will not speculate about such strategy; it is Warren's burden to provide affirmative proof of deficient performance. *Bone*, 77 S.W.3d at 833. Warren has not informed us of any available mitigating evidence that was not argued or any supporting witness who was not called, and we cannot expect counsel to present nonexistent evidence or to call nonexistent witnesses. Further, given that the jury sentenced Warren to only nine years, far less than urged by the State, it does not appear that counsel's decision to not introduce additional evidence at punishment was prejudicial to Warren. *See Hernandez*, 988 S.W.2d at 772. Warren's third issue is overruled.

### *General Ineffective Assistance*

In his final issue, Warren asserts that his counsel's representation, taken in its entirety, fell below an objective standard of professional legal services. As support for this claim, Warren contends that his counsel "did not have a good grasp of the facts," and "often seemed confused . . . and unable . . . to pursue important issues." Specifically, Warren points to the following conduct: (1) counsel's failure to effectively cross-examine both Angela (A.W.'s mother) and Mark (Warren's

16

brother), and (2) counsel's failure to seek a continuance when subpoenaed CPS records were not timely produced.

We have reviewed the record in its entirety and have determined that it does not support Warren's claim of general deficiency by his counsel. Overall, his counsel appeared to be well-aware of the relevant facts and provided an apt defense, using the appropriate rules of procedure and evidence. Any isolated misstatement or temporary moment of confusion is not outside the bounds of reasonable legal service and is insufficient to deem his counsel's assistance ineffective.[9] *See Wilkerson*, 726 S.W.2d at 548 (ineffective assistance will not be judged on counsel's isolated acts or omissions).

Moreover, looking specifically at Warren's counsel's cross-examination of Angela and Mark, we cannot say that his performance fell below the reasonable standard. First, he elicited testimony from Angela that he later used at closing to argue that she had questioned A.W. in a leading fashion and, thus, A.W.'s allegations were not credible. Warren contends that his counsel should have pursued Angela's statement that she "had reasons" to believe, before questioning A.W., that A.W.'s father was the perpetrator. However, the State immediately approached the bench and objected that Angela's response was based on hearsay. The court instructed Warren's counsel to narrow the question to eliminate hearsay testimony, and counsel complied by asking Angela if she had any "personal knowledge" that would lead her to suspect A.W.'s father. When she responded

_____

[9] For instance, one example cited by Warren is that his counsel accidently addressed Angela by her daughter's name, which also begins with an "A" and sounds similar. We will not hold such minor, inconsequential mistakes to render counsel's assistance ineffective.

17

in the negative, counsel moved on, and we cannot speculate as to his reasons for not pursuing it further. *See Tong*, 25 S.W.3d at 714.

Second, in cross-examining Mark, Warren's counsel cast doubt on his testimony by demonstrating that Mark had never mentioned his alleged discussion with Warren until the day before trial, that Mark permitted his children to be around Warren even after learning that Warren had inappropriate contact with A.W., and that Mark's memory was affected by his use of marijuana. Counsel also emphasized this evidence at closing. Warren contends that his counsel was deficient in impeaching Mark for his prior convictions. A review of the record, however, demonstrates that his performance was reasonable.[10] Furthermore, in the face of a record that is silent as to counsel's reasons for his decisions, Warren has not overcome the presumption that his counsel's conduct was based on sound strategy. *See id*.

Finally, Warren's contention about the CPS records is also insufficient to overcome the presumption that his counsel's assistance was effective. Prior to voir dire, Warren's counsel noted that the State had failed to produce the CPS records, which had been subpoenaed. However,

---

[10] The issue of whether Mark could be impeached on his criminal history was discussed outside the jury's presence. Mark admitted to various convictions for which he had completed probation. Warren's counsel agreed that these were not impeachable offenses. *See* Tex. R. Evid. 609(c). The parties agreed that the only conviction on which Mark could be impeached was a "$10 fine on the Class C issuance of a bad check charge," and Warren's counsel said he was "not really worried about" impeaching Mark on such a minor offense. Counsel stated that the only crime he was interested in for impeachment purposes was Mark's "pending charge, because it goes to his state of mind, his bias to curry favor with the State." The court agreed that a witness could be impeached on a pending case. When the jury returned, the State concluded its examination of Mark by asking whether he had a "pending violation of [a] protective order case," and Mark said "yes." Warren's counsel did not ask Mark anything further about the pending charge, but counsel did argue at the closing of guilt/innocence that Mark's pending charge could provide him with a motive to lie and testify in favor of the State.

18

he said that the State had given him copies, and his concern appeared to be only that copies be produced as part of the appellate record. The State assured the court that the records would be produced before the conclusion of trial, and they were. Again, Warren has not established ineffective assistance based on his counsel's decision to not seek a continuance because the record reflects nothing about his counsel's strategy regarding this decision. *Id.*

Additionally, as to each of the above acts and omissions, Warren offers no proof that he was prejudiced by any of them. His brief asserts merely that the cumulative effect of these decisions "quite possibly affect[ed] the outcome" of his trial. An appellant's speculation and conjecture, however, does not provide sufficient proof on which to determine that he was prejudiced by his counsel's representation. *Ex parte Cash*, 178 S.W.3d at 818-19; *Thompson*, 9 S.W.3d at 813. We therefore hold that Warren has failed to demonstrate by a preponderance of the evidence that his counsel's representation, in its entirety, was ineffective. Warren's fourth issue is overruled.

## DOUBLE JEOPARDY

Our review of the record discloses unassigned error that should be addressed in the interest of justice. *See Wright v. State*, 981 S.W.2d 197, 199 n.2 (Tex. Crim. App. 1998) (appellate court may, in its discretion, consider unassigned error). It is clearly apparent on the face of the record that Warren's convictions on all three counts of the indictment constitute double jeopardy. *See Gonzalez v. State*, 8 S.W.3d 640, 643 (Tex. Crim. App. 2000) (explaining when double jeopardy may be raised for first time on appeal); *Duvall v. State*, 59 S.W.3d 773, 777 (Tex. App.—Austin 2001, pet. ref'd (same)).

19

The Fifth Amendment double jeopardy clause protects against prosecution for the same offense after a conviction or an acquittal, and against multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969). The clause is enforceable against the states through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 787 (1969). In this cause, there is a multiple-punishments violation.

The record contains evidence of only one act that can support a conviction under any of the three counts of the indictment. On this one occasion, Warren penetrated A.W.'s mouth with his penis. During their closing arguments to the jury, both prosecutors stated that this conduct alone justified Warren's conviction on each count of the indictment.

When the same conduct violates two distinct statutory provisions, the first step in the double jeopardy analysis is to determine whether the legislature intended that each violation be a separate offense. *Garrett v. United States*, 471 U.S. 773, 778 (1985). The court of criminal appeals has held that, although the legislature intended harsh penalties for sexual abuse of children, it did not intend to authorize "stop-action prosecutions." *Patterson v. State*, 152 S.W.3d 88, 92 (Tex. Crim. App. 2004). That is, a defendant cannot be convicted for a completed act of sexual assault and also for conduct that is demonstrably part of the commission of the completed act. *Id.*

Sexual contact or exposure that occurs in the course of an act of sexual penetration is subsumed in the completed act. *Id.*; *see Barnes v. State*, 165 S.W.3d 75, 88 (Tex. App.—Austin 2005, no pet.). A conviction for both the completed act of penetration and for the sexual contact or exposure incident to the penetration constitutes double jeopardy. *See Barnes*, 165 S.W.3d at 88 (convictions for sexual assault by penetration and by genital-to-genital contact based on single act

20

of penetration constituted double jeopardy); *Patterson v. State*, 96 S.W.3d 427, 432-33 (Tex. App.—Austin 2002), *aff'd*, 152 S.W.3d at 92 (convictions for sexual assault by penetration and indecency by contact based on single act of penetration constituted double jeopardy). In the cause now before us, the constitutional guarantee against double jeopardy was violated when Warren was convicted for penetrating A.W.'s mouth with his penis and also for the contact and exposure that was incident to and subsumed within that one act of penetration.

The proper remedy when a defendant is convicted of two offenses in violation of the double jeopardy clause is to set aside the conviction for the offense carrying the less serious punishment. *Landers v. State*, 957 S.W.2d 558, 560 (Tex. Crim. App. 1997). Accordingly, we will reverse Warren's convictions for indecency with a child.

## CONCLUSION

The judgments of conviction for indecency with a child by contact and indecency with a child by exposure are reversed and those causes are dismissed. The judgment of conviction for aggravated sexual assault is affirmed.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed in Part; Reversed and Dismissed in Part

Filed: March 2, 2006

Do Not Publish