# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-04-00382-CR
NO. 03-04-00383-CR
NO. 03-04-00384-CR
NO. 03-04-00385-CR
NO. 03-04-00386-CR
NO. 03-04-00387-CR

**James Lee Cinnamon, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF CONCHO COUNTY, 119TH JUDICIAL DISTRICT
NOS. 1456, 1457, 1458, 1459, 1460 & 1461, HONORABLE BEN WOODWARD,
JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Appellant James Lee Cinnamon and his wife, Donna Cinnamon, married in 1996. At the time of their marriage, appellant had two sons, D.P., born in May 1991, and T.C., born in January 1993.[1] Donna had two sons, J.R., born in December 1991, and J.S., born in August 1993, and one daughter, A.C., born in September 1995. Appellant adopted A.C. and was stepfather to J.R.

---

[1] D.P. and T.C. are half-brothers. Appellant is D.P.'s stepfather, not his natural father. D.P.'s mother married appellant when D.P. was about fifteen months old, and during their marriage, T.C. was born. Their mother committed suicide when D.P. was three or four, and both boys stayed in appellant's care.

and J.S. During the marriage, the Cinnamons had another daughter, P.C., born in August 1997. In 1998, all four of the boys were sexually abused by their fifteen-year-old uncle Jonathan, who was convicted and imprisoned for that crime. The Cinnamons lived in Lubbock, Texas, until late 1999, when they moved to Eden, Texas.

In May 2001, the Department of Protective and Regulatory Services received a report that the children were being neglected. The Department removed the children from the Cinnamons' home, placed them in foster care, and sent them to counseling. In July 2001, A.C. and P.C. made outcries of sexual abuse to their counselor, Jan Denson. In early August 2001, D.P. and T.C. made outcries of sexual abuse to their therapist, Robert Mahoney.[2] In late August 2001, J.R. made an outcry to his foster father, Stephen S.,[3] and J.S. made his outcry to Lynn McFadden, a Department investigator, in September 2001. The abuse was alleged to have happened in mid-2000, when P.C. was about three, A.C. was about five, J.S. and T.C. were about seven, and J.R. and D.P. were between eight and nine. P.C. and A.C. were interviewed in July 2001 by Melody Jeter, lead interviewer for a children's advocacy center. McFadden interviewed D.P. and T.C. in August 2001 and J.S. and J.R. in September 2001.

Appellant was indicted in six separate cause numbers for aggravated sexual assault of the six children. *See* Tex. Pen. Code Ann. § 22.021(a)(1)(B) (West Supp. 2005). Trial was held in 2004, and the jury convicted appellant of eighteen counts of aggravated sexual abuse as follows:

---

[2] Mahoney was the therapist for all four boys.

[3] Stephen and Lisa S. are the foster parents with whom the four boys were placed for several months. D.P. and T.C. were placed there soon after their removal from the Cinnamons' care, and J.S. and J.R. were placed there later.

- Causing his mouth to contact A.C.'s sexual organ, causing her mouth to contact his anus and sexual organ, using his finger to penetrate her sexual organ, and penetrating her mouth with his sexual organ (trial court case number 1456, our cause number 03-04-00382-CR).

- Causing his mouth to contact P.C.'s sexual organ and anus, causing her mouth to contact his anus and sexual organ, and using his finger to penetrate her sexual organ (trial court case number 1457, our cause number 03-04-00383-CR).

- Penetrating D.P.'s mouth and anus with his penis (trial court case number 1459, our cause number 03-04-00385-CR).

- Penetrating J.R.'s mouth and anus with his penis (trial court case number 1461, our cause number 03-04-00387-CR).

- Penetrating T.C.'s mouth and anus with his penis (trial court case number 1460, our cause number 03-04-00386-CR).

- Penetrating J.S.'s mouth and anus with his penis (trial court case number 1458, our cause number 03-04-00384-CR).

The jury sentenced appellant to seventy-five years' imprisonment. In his first six issues, appellant contends that the evidence is legally and factually insufficient to support his convictions. In his seventh issue, he argues that he received ineffective assistance of counsel because his attorney did not object during the guilt/innocence phase of the trial to evidence of extraneous offenses committed by appellant. As discussed below, we reverse the convictions in count five in trial court case numbers 1456 and 1457 and count one in case numbers 1459 and 1460. We affirm the judgments of conviction as to all other counts in all six causes.

## Standard of Review

We review a trial court's ruling on a motion for a directed verdict under the same standards used to review the sufficiency of the evidence. *Rabbani v. State*, 847 S.W.2d 555, 556

3

(Tex. Crim. App. 1992); *Rodriguez v. State*, 939 S.W.2d 211, 218 (Tex. App.—Austin 1997, no pet.) (op. on reh'g). In evaluating the legal sufficiency, we view the evidence in the light most favorable to the verdict and ask whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). In reviewing the factual sufficiency, we view the evidence in a neutral light and will set aside a verdict only if the supporting evidence is so weak that the verdict is clearly wrong or the contrary evidence is so strong that jury could not have found all the elements of the crime beyond a reasonable doubt. *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005). A verdict is clearly wrong and unjust if the "jury's finding is 'manifestly unjust,' 'shocks the conscience,' or 'clearly demonstrates bias.'" *Id*. (quoting *Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997)). The jury, as trier of fact, is "the exclusive judge of the credibility of witnesses and of the weight to be given their testimony. Likewise, reconciliation of conflicts in the evidence is within the exclusive province of the jury." *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996) (internal citations omitted); *see Barnes v. State*, 62 S.W.3d 288, 298 (Tex. App.—Austin 2001, pet. ref'd). The finder of fact may accept or reject all or any of the evidence presented by either side, may draw reasonable inferences from the evidence, and must reconcile any evidentiary conflicts. *Barnes*, 62 S.W.3d at 298. We determine the sufficiency of the evidence by viewing the cumulative effect of all the evidence, not each fact in isolation. *Id.* at 297. Any inconsistencies in the evidence should be resolved in favor of the verdict. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). This standard of review is the same for both direct and circumstantial evidence. *Barnes*, 62 S.W.3d at 297.

## Summary of the Evidence

Because appellant challenges the legal and factual sufficiency of the evidence supporting all of the counts in all six causes, a fairly detailed recitation of the evidence is necessary.

Jan Denson was the girls' therapist and was the witness who heard the first outcries of abuse from any of the children. She testified that from the beginning, the girls put dolls together in sexual positions and talked about how the dolls "are kissing each other all over." Denson worked with the girls over time to observe repetitive patterns in how the girls played with the dolls or what they said. In July 2001, Denson had separate sessions with each girl. During her session, A.C. told Denson about an incident when her parents and brothers were in the room she shared with P.C. A.C. said that everyone was naked and that appellant and Donna Cinnamon were "on top of each other on the floor." A.C. said that J.R. was on top of her, J.S. was on top of P.C., and D.P. and T.C. were "standing front to back, with their genitals touching." A.C. told Denson that her parents told the children what to do and to kiss each other all over. A.C. also described another incident in which appellant came into the girls' room and took their clothes off. Appellant kissed A.C. on her genitals and her anus and "did the same thing to P.C." while A.C. watched. Appellant then told "both of the girls to kiss him" on his genitals. A.C. showed Denson "the little girl doll's . . . mouth being at his penis. And she said that she and [P.C.] got to laughing about it and said: Kiss Daddy's weiner. And then she turned over the male doll that she used as daddy and said that daddy said to also kiss him there, referring to what would have been his anus." A.C. told Denson that she and P.C. kissed appellant on his penis and his anus. Finally, A.C. told Denson about a third incident when she and the other children were in their parents' bedroom, naked and on their parents' bed. A.C. again

5

described her parents telling the children what to do to each other, and she said that her mother "told them to kiss dad all over."

After speaking to A.C., Denson immediately spoke to P.C., who told Denson that "she had seen her mom and daddy kiss each other down there and all of the boys had kissed her down there and her mama and daddy had both kissed her down there." P.C. "didn't go into as much detail as [A.C.]," but she talked about her parents being naked and on top of each other and said that J.S. "would be on top of her" and that J.R. would get on top of A.C. P.C. told Denson that her parents told her to kiss their genitals and she laughed and said, "Sometimes me and [A.C.] would kiss Daddy's weiner." After their initial outcries, the girls told Denson that "Daddy would get us sexing and we could see it on the computer," and A.C. drew a picture of the house showing where the bedrooms and the computer were. Denson said that the girls stayed consistent with their outcries.

During a play-date between the girls and the boys, Denson and the boys' therapist watched the children go into an enclosed playhouse to "play Mom and Daddy." The children showed very sexualized behavior toward each other, and P.C. was particularly aggressive toward the boys. The children used the term "sexing," which the girls said was "kissing each other all over," but T.C. said was "putting your middle in someone's butt." A.C. seemed embarrassed to talk with her brothers present, but she showed with the dolls how "they had laid down side-by-side." D.P. once corrected J.R., saying, "Nobody had their clothes on and we were all doing it." J.S. became frustrated and put the dolls on top of each other and said, "This is the way that it was."

Robert Mahoney, the boys' therapist, testified that in early to mid-August 2001, after he learned of the girls' outcries, he spoke to D.P. and T.C. in separate sessions. When Mahoney told

6

D.P. that his sisters had said "that there are some other things that are going on in the home," D.P.'s eyes widened, he was quiet for a couple minutes, and then "he started sharing that . . . there was a lot of sexual acting-out going on between the siblings. . . . And then he later revealed that he and the other boys were being sexually abused by" appellant. D.P. told Mahoney that the abuse was through "[o]ral and anal sex." Mahoney testified that he spoke to D.P. for an hour to an hour and one-half to give D.P. "several chances to . . . back out of the story if—if it wasn't true." He said, "That's why we kind of separated, you know, girls and the boys, to make sure that they weren't getting together and making up, you know, stories and collaborating."

Mahoney interviewed T.C. next. He also told T.C. that the girls had said there were other things happening in the home, and T.C. got very quiet and then said that there was "sexual acting-out among all the siblings and that there was sexual abuse" in the home. Mahoney gave T.C. the same opportunity to back out of his story, but T.C. made the same allegations as D.P., that appellant had abused him through oral and anal sex. Mahoney did not see any signs that the boys had talked about their allegations before telling Mahoney what had happened.

Mahoney said that J.S. "probably has the most difficulty recalling specific details surrounding the sexual abuse by the parents. However, his memories seem to support those reported by the brothers." J.S. has difficulty with the concept of time and with remembering details. Mahoney said that T.C. in particular made more detailed allegations as time went on.

Stephen S. testified that he and his wife Lisa were foster parents for the boys in the summer of 2001. In late August 2001, J.R. told Stephen that appellant had sexually abused him, using words such as "pee-pee," "sex thing," and "middle" to refer to a penis. Stephen said that J.R.

7

made "accusations that [appellant] taught him how to swallow the liquid or spit it out or things of that nature." J.R. told Stephen that his mother had also had sex with him and that his grandmother took pictures of him. J.R. also said that Uncle Jonathan had sex with A.C., J.R.'s grandmother, and Donna Cinnamon; Stephen was not aware until trial that Uncle Jonathan had been in prison since 1998 and had never lived in Eden. Stephen and his wife also testified that D.P. had lied and said that they were abusing him because he wanted to be placed in a different home.

Department investigator McFadden testified that in September 2001, J.S. told him that appellant touched J.S.'s "boo-hinie" with appellant's "front private." J.S. said "that one time [appellant] actually touched him inside of his body" and that it hurt. McFadden said that in an interview with T.C. in early 2000, T.C. said that no one had tried to touch his privates and that if anyone did try, T.C. would tell his parents. Teri Trull, the Department caseworker assigned to the children, testified that she spoke to the children after she learned about their outcries, and that the boys were verbal, P.C. refused to talk about it, and A.C. told her that "her mother told her she could not talk about the nasty stuff or the sex thing." Instead, A.C. showed Trull what had happened using Denson's dolls and by drawing pictures.

Melody Jeter interviewed the girls in July 2001, after Denson reported their outcries; at the time, A.C. was five and P.C. was three. Jeter videotaped those interviews, and in P.C.'s interview, she said that her daddy had touched her with his "weiner" and with his finger. Jeter asked, "Who tried to touch [you] with [their] weiner?" P.C. answered, "My Daddy," but then said, "He doesn't want me to." P.C. said that she had touched A.C. and her brothers while their clothes were on. She also said she saw her brothers' "wieners" when they did not shut their bathroom door and

8

that she saw her parents naked when they were "doing fun." In A.C.'s interview with Jeter, she said she was not supposed to tell anyone "[i]f somebody touches you down there." She then said, "And my—my daddy didn't touch me down there." She said, "Mans and boys can't touch us down there," on her "pee-pee." A.C. said that Denson taught her to say no if someone tried to touch her down there and that she had never seen her parents or brothers naked. Later in the interview, she was playing with Jeter's dolls and said that two dolls were P.C. and J.S. and that they were "sexing," but then she said she had never seen P.C. and J.S. "do that" and said she had never done any sexing. She said that the mommy and daddy dolls were sexing, but that "[n]obody didn't teach me how to do it."

All six children gave testimony through videotapes taken in October 2003. D.P. testified that appellant penetrated his "butt" with his penis "[a] whole lot," "[a]ny time he felt like doing it." D.P. said that Donna was usually present, as were the other children, and that he saw appellant penetrate the other boys' anuses with his penis. D.P. testified that appellant sometimes made D.P. put his mouth on appellant's penis. D.P. said that appellant had a camera in the bedroom to record the family's sexual activity and put it on the computer and had pictures of the children naked and of him and Donna having sex. D.P. testified that he had seen his grandmother naked and having sex with appellant. D.P. denied seeing his Uncle Mike, who was a police officer, or Aunt Tracie naked, but he said that appellant sent pictures of the children to Mike, "so they knew what was going on." D.P. also said that when another uncle, Uncle Tracy, babysat for him and the other boys in Lubbock, he had sex with his girlfriend in front of them.

D.P. admitted that he told lies about his foster parents because he thought they were too strict and he wanted to get out of the foster home. However, he testified that he was not lying

9

about what the Cinnamons did to him and the other children and that he was not confusing what his Uncle Jonathan did with what his parents had done. D.P. also said that the Cinnamons had beaten him and the other children, thrown them into walls and off a porch, and pinched them with pliers.

T.C. testified that appellant "put his private in my bottom" often and that he saw appellant do the same to the other boys. T.C. said that appellant made T.C. touch and hold appellant's privates with his hand and that appellant put his mouth on T.C.'s private. T.C. testified that Donna knew about the abuse and "did it with us, too." T.C. reported that he had seen his grandmother naked and that she took pictures of the family naked. He testified that Aunt Tracie and Uncle Mike were naked with the children and took pictures that they put on the computer, and said that he told Trull that Mike put "his private in our bottom" and that Tracie made them suck "her top." T.C. said he never talked to J.S. or J.R. about what abuse he had reported.

J.R. testified that appellant "put his privates in my butt, his front part" and made J.R. put his "private in [appellant's] back part." J.R. said that appellant put his mouth on J.R.'s penis and had J.R. do the same to appellant's penis. J.R. said that Donna did not know about appellant's abuse and denied that he had seen anything happen between appellant and the other children, but he did see pictures of naked people, including aunts and uncles, on appellant's computer. J.R. never saw his grandmother or his Uncle Mike and Aunt Tracie naked, nor did he ever see any of those adults taking pictures of the children.

J.S. explained that he refers to his penis as his "privates" and his anus as his "bootie." He testified that appellant stuck "his private up my bootie" many times and sometimes put his private

10

in J.S.'s mouth.[4] J.S. saw appellant do the same to his brothers and sisters, and he saw on the computer pictures of the children and the Cinnamons naked and having sex. J.S. testified that he saw his parents having sex while he was in bed with them. J.S. said he told Trull "[t]hat they stick their[] private up ours. And they made us stick our[] private up theirs." J.S. testified that he never saw his grandmother, Uncle Mike, or Aunt Tracie naked; he saw Uncle Tracy naked and having sex with his girlfriend when they lived in Lubbock. J.S. said that his grandmother took pictures of the children, but only when they were dressed, such as at a birthday party. J.S. also said that Uncle Jonathan had sex with all of the boys and with the girls.

A.C. testified that her father had put his private in her private "a lot" and made her kiss his private. She was asked, "Did you ever put your mouth on [appellant's private]," and she

---

[4] J.S.'s testimony on this point went as follows:

Q. Did [appellant] ever put his private in your mouth?

A. Yes.

Q. Did that—did he do that very often?

A. Not that often.

Q. Okay. Did you ever do the same thing to him?

A. Yes.

Q. Put your mouth on his private?

A. Not that.

Q. You didn't do that?

A. No, sir.

11

answered that she had. She also said that appellant had kissed her privates, "[b]oth front and back." She stated that appellant had touched her on the front of her private and had put his finger inside her private. A.C. remembered telling Jeter that no one had ever touched her private. She said that the first person she told about the abuse was Denson, who testified about the girls' outcry statements. A.C. testified that J.R. had taken pictures of her and the other children and put them on the computer. She also recounted an incident in which she said her siblings, parents, grandmother, and aunt were all naked, and two clothed police officers, including Uncle Mike, watched; but A.C. then testified that she had never seen her grandmother naked.

P.C. was asked whether appellant ever did anything bad to P.C. with a part of his body. She answered, "Huh-uh," and, "No." She was asked, "So you don't remember," and she answered, "Huh-uh."

Appellant produced evidence showing that D.P. had lied about his foster parents because he wanted to move out of their house, and Lisa S. testified that all four boys "told stories a lot." Appellant also produced testimony about Uncle Jonathan's abuse of the boys and about several reports of alleged neglect of the children by Donna or appellant. The Department found that the first report of Donna's neglect of J.S., J.R., and A.C., made before the Cinnamons married, was true; other allegations made in 1998 and 1999 were ruled out and the cases were closed. Dr. William Cofield, Jr., testified that he performed psychological evaluations of the children in 2001 and 2003. In 2001, none of the children made any allegations of sexual abuse by the Cinnamons. In 2003, he interviewed the children to "make observations which may be relevant" at trial. He found that "lying is one of [D.P.'s] most prominent difficulties" and that D.P. had been described as "so manipulative"

12

and as someone who would pit adults against each other. When he examined P.C. in 2001, he "ruled out sexual abuse." Dr. Richard Wall, a clinical psychologist, testified, "It is a reasonable possibility, that is, a significant possibility rather than a remote possibility, that all the data that has been considered in this case can be accounted for by sexual play-abuse among the siblings," rather than sexual abuse by the Cinnamons. Wall stated that it was probable that children once abused sexually would "continue to engage in sexual play thereafter." A district attorney's office investigator testified that in June or July 2001, law enforcement seized a computer from the Cinnamons' home, on which they found sexual pictures of appellant and Donna and pornographic images from the Internet, but no pornographic pictures of the children.[5]

Appellant denied all of the allegations made by the children. Asked why the children would invent such stories, he answered, "I've sat and thought about it and thought about it and the only thing I can think of is this previous, you know, sexual—being sexually molested from Jonathan. And I guess it's just been really traumatic on them. And then being taken away from us and, you know, away from their home . . . all this has been a traumatic experience on them. That's the only thing I could think of, you know . . . besides being talked to over and over and all that." Appellant admitted taking pictures of Donna and himself and putting them on the computer, but denied taking pictures of the children in any kind of sexual situation. Donna Cinnamon, who was also indicted for sexual abuse of the children, testified that Jonathan taught the boys the term "sexing." Donna said that she and appellant took sexual pictures of each other and put them on the computer, but testified

---

[5] There was some testimony about whether appellant had rented or owned a second computer in the past, but the evidence was not clear on this point. This was the only computer found in the Cinnamons' home.

that the children were not present when the pictures were taken. Donna testified that she was not aware that the children were sexually active while the family lived in Eden and she denied all of the children's allegations. She learned of the accusations about a year after the children were removed from the home and said that the Department had "organized this conspiracy." Appellant's mother denied taking pictures of the children while they were naked or having sexual contact with appellant.

On rebuttal, the State called one of the Cinnamons' neighbors in Eden, who testified that she once entered the Cinnamons' house and saw the children running around inside while appellant watched pornography on the computer; Donna was present and stood in front of appellant. Kathy Ellis, a school nurse in Eden, testified that the boys were often hungry, sometimes had fleas and ticks in their hair, had small injuries, sometimes lacked socks, and were unkempt or wore dirty clothes. Ellis once saw scratches on T.C.'s neck; he said his mother had done it, but also said that "maybe the cat did it."

**Sufficiency of the Evidence as to P.C.**

Appellant argues that the trial court should have granted his request for a directed verdict as to the charges that he assaulted P.C. He asserts that the evidence is legally and factually insufficient to support any of the counts. The court's charge authorized appellant's conviction on findings that appellant: caused P.C.'s sexual organ to contact appellant's mouth (count one), caused P.C.'s anus to contact appellant's mouth (count two), caused P.C.'s mouth to contact appellant's anus (count three), caused P.C.'s mouth to contact appellant's sexual organ (count four), and penetrated P.C.'s female sexual organ with his finger (count five).

14

In her 2003 testimony, P.C. denied that appellant had ever done anything bad to her with his body. However, in her July 2001 interview, P.C. told Jeter that her daddy had touched her with his "weiner" and with his finger. Further, Denson testified that from her very first sessions with P.C. and A.C., the girls put dolls together in sexual positions, and that A.C. told Denson that appellant kissed her genitals and her anus, "did the same thing to P.C.," and told both girls to kiss his penis and anus. When Denson spoke to P.C., P.C. said that "her mama and daddy had both kissed her down there" and told her to kiss them on their genitals. P.C. said, "Sometimes me and [A.C.] would kiss Daddy's weiner." During the girls' play-date with the boys, the children showed sexualized behavior toward each other, and P.C. was especially aggressive toward the boys. The children used the term "sexing," which the girls described as kissing all over, but that T.C. said was "putting your middle in someone's butt."

Based on this record, we hold that the evidence is legally and factually sufficient to support the jury's verdicts on counts one through four. The jury, as trier of fact, was the exclusive judge of the witnesses' credibility and the way in which evidentiary conflicts should be reconciled. *See Jones*, 944 S.W.2d at 647. It was for the jury to accept or reject all or any of the evidence presented by either side and to draw reasonable inferences from the evidence. *See Barnes*, 62 S.W.3d at 298. Based on Denson's testimony of the girls' outcry statements, combined with P.C.'s 2001 interview and the other evidence about the children's behavior, a rational jury could have found the essential elements of the first four counts beyond a reasonable doubt. *See Johnson*, 23 S.W.3d at 7. Even when viewed in a neutral light, the evidence supporting the verdict is not so weak that the verdict is clearly wrong, nor is the contrary evidence is so strong that jury could not have found all the elements of the crime beyond a reasonable doubt. *Prible*, 175 S.W.3d at 731. Viewing the

15

evidence as a whole, not in isolation, *see Barnes*, 62 S.W.3d at 297, and resolving any inconsistencies in favor of the verdicts, *see Moreno*, 755 S.W.2d at 867, the evidence is legally and factually sufficient to support the jury's verdicts that appellant sexually abused P.C. as described by counts one through four.

As for count five, however, we hold the evidence is insufficient to support the conviction. A.C. testified that appellant touched her inside her private, but P.C. made no such statements. P.C. said that appellant touched her with his finger, but did not make any statements giving rise to an inference of penetration. The penal code provides that a person commits aggravated sexual assault if he penetrates a child's sexual organ "by any means." Tex. Pen. Code Ann. § 22.021(a)(1)(B)(i). If a person touches a child's anus, breast, or genitals with a sexual intent, he commits indecency with a child. *Id*. § 21.11 (West 2003). Penetration therefore is a necessary element of count's five's allegation of the offense of aggravated sexual assault. The only way to support this conviction would be to assume that because appellant penetrated A.C.'s sexual organ with his finger, he must have done the same to P.C. Such an inference is not supported by the evidence. We hold that the evidence is legally insufficient to support the conviction on count five.

We overrule appellant's first issue as to counts one through four. We sustain his issue as to count five, and we reverse the conviction as to count five in trial court case number 1457 (our cause number 03-04-00383-CR).

**Sufficiency of the Evidence as to A.C.**

The court's charge authorized appellant's conviction on findings that appellant: caused A.C.'s mouth to contact appellant's sexual organ (count one), caused A.C.'s mouth to contact

16

appellant's anus (count two), caused A.C.'s sexual organ to contact appellant's mouth (count three), penetrated A.C.'s sexual organ with his finger (count four), and penetrated A.C.'s mouth with his sexual organ (count five). Appellant argues that the evidence is legally insufficient to support the convictions for counts two and five. He argues that there was no evidence presented as to count five and that, because A.C. said "[h]uh-uh" when asked whether she ever touched appellant's anus with her mouth, the evidence is legally insufficient to support count two. He argues that the evidence is factually insufficient to support the jury's verdict as to counts one, three, and four because the evidence is "for the most part," A.C.'s affirmative answers to "a series of leading questions" asked by the State. Appellant argues that A.C.'s testimony that other people, including her grandmother and two police officers, were sometimes present shows that the guilty verdict is clearly unjust.

A.C. testified that appellant had kissed her privates, "[b]oth front and back." Denson testified that A.C. told her that appellant "said to also kiss him there, referring to what would have been his anus," and that she and P.C. kissed appellant on his anus. This evidence provides legally sufficient support for the jury's verdict as to count two, and as discussed above, even when the evidence is viewed neutrally, the evidence is factually sufficient to support the verdict on count two. As for counts one, three, and four, as in the counts related to P.C., the evidence is legally and factually sufficient to support the jury's verdicts. A.C. both testified and made an outcry that appellant kissed her "down there," had her kiss him on his "weiner," and put his finger inside her privates. Her testimony concerning the presence of others posed a credibility issue for the jury's consideration.

17

Count five, however, alleged that appellant *penetrated* A.C.'s mouth with his sexual organ. A person commits the offense of aggravated sexual assault if he either penetrates the child's mouth with his sexual organ or causes the child's mouth to contact his sexual organ. *See id.* § 22.021(a)(1)(B)(ii), (v). A.C. testified that she had kissed appellant's private and when asked if she ever "put her mouth on it," she said yes. However, the State never asked whether appellant put his private *in* her mouth, and A.C.'s statements and testimony do not show that appellant penetrated her mouth with his penis. Penetration is a necessary element of count five, and there is no evidence of penetration, as opposed to contact. Therefore, the evidence is legally insufficient to support the jury's verdict as to count five.

We overrule appellant's second issue as to counts one through four. We sustain his second issue as to count five. We therefore reverse the jury's guilty verdict on count five in trial court case number 1456 (our cause number 03-04-00382-CR).

**Sufficiency of the Evidence as to J.S.**

Appellant was charged with penetrating J.S.'s mouth (count one) and J.S.'s anus (count two) with his penis. Appellant contends that the evidence is legally and factually insufficient to support his conviction as to J.S. Because J.S. said, "Not that," when asked whether J.S. had "put [his] mouth on his private," appellant argues that the evidence is legally insufficient to support count one. He argues that the evidence is factually insufficient to support the conviction for count two because J.S. said he "forgot" what he called the parts of his body where he goes to the bathroom and did not know if he called it his "front side."

18

Although J.S. did say he had not put his mouth on appellant's private, J.S. also said "[y]es" when asked if appellant "put his private in" J.S.'s mouth. We cannot infringe on the jury's reconciliation of evidentiary conflicts and evaluation of the testimony. *See Jones*, 944 S.W.2d at 647. Therefore, we hold the evidence is legally and factually sufficient to support the jury's finding of guilt as to count one. As for count two, J.S. said that appellant stuck "his private up my bootie," and D.P. and T.C. testified that they saw appellant put his penis in the other boys' anuses. McFadden testified that J.S. told him that appellant touched J.S.'s "boo-hinie" with his "front private" and that appellant "touched him inside of his body." The evidence is legally and factually sufficient to support the finding of guilt as to count two. We overrule appellant's third issue.

**Sufficiency of the Evidence as to D.P.**

Appellant asserts that the evidence is factually insufficient to support the jury's convictions as to D.P., largely basing his argument on evidence that D.P. frequently lied.

The only evidence as to appellant's penetration of D.P.'s mouth was D.P.'s statement in his 2003 interview that appellant "made me put my mouth on his penis." D.P. said this did not happen very often, and the State asked, "Not near as much as the other penetration in your bottom?" D.P. answered, "Yes, sir." Mahoney testified that D.P. said he had been abused through "oral sex and anal sex," but Mahoney was not asked and did not testify as to what "oral sex" meant.

As in the case of the allegations made with regard to A.C., there is no evidence that appellant penetrated D.P.'s mouth with his penis, only that he caused D.P.'s mouth to contact appellant's penis. Although both oral penetration and oral contact constitute the offense of aggravated sexual assault, *see* Tex. Pen. Code Ann. § 22.021(a)(1)(B)(ii), (v), the State did not

charge appellant with causing D.P.'s mouth to contact appellant's penis. Instead, it charged him with penetration. Without evidence of more than contact, the evidence is legally insufficient to show that appellant committed count one as to D.P.

The evidence is both legally and factually sufficient as to count two, however. D.P. testified that appellant penetrated D.P.'s "butt" with his penis, and T.C. said that he saw appellant put his private in D.P.'s private. Although there were some inconsistencies in the children's testimony and despite D.P. admitting that he lied to get placed out of his foster home, those issues were for the jury to consider. We will not second-guess the jury's determination of witness credibility or the reconciliation of evidentiary conflicts. We sustain appellant's fourth issue with regard to count one, and overrule his issue as to count two. We reverse the jury's conviction for count one in trial court case number 1459 (our cause number 03-04-00385-CR).

**Sufficiency of the Evidence as to T.C.**

Appellant argues that the evidence is legally and factually insufficient to support the jury's guilty verdict as to count one and that the evidence is factually insufficient to support count two because of T.C.'s testimony that his grandmother, Uncle Mike, and Aunt Tracie were sometimes present for the abuse. Appellant argues that he is not seeking to have this Court "evaluate the credibility of the witness but to review the factual sufficiency of the evidence."

T.C. testified in his 2003 interview that appellant "put his private in my bottom." T.C. also said that appellant "put his mouth on [T.C.'s] private." Mahoney said that appellant made the boys perform "oral and anal sex," but did not provide any further details. The evidence is both legally and factually sufficient to support the jury's verdict of guilt as to count two, which alleged

that appellant penetrated T.C.'s anus with his penis. Despite some inconsistencies in the evidence, T.C. stated that appellant put his "private" in T.C.'s "bottom," and D.P. said that he saw appellant put his penis in D.P.'s brothers' anuses. T.C. asserted that his grandmother, aunt, and uncle were present. Even assuming that these claims were completely disproved or utterly unbelievable, however, does not require the jury to disregard T.C.'s testimony altogether. The jury could have believed some, but not all, of T.C.'s testimony. *See Jones*, 944 S.W.2d at 647; *Barnes*, 62 S.W.3d at 298. We overrule appellant's fifth issue as to count two.

Count one, however, is not supported by sufficient evidence. T.C. said that appellant put his mouth on T.C.'s private, but T.C. was not asked whether he was forced to put his mouth on appellant's penis, much less whether appellant put his penis inside T.C.'s mouth. Mahoney said that T.C. was subjected to oral and anal abuse, but did not provide further explanation. There is no evidence that appellant penetrated T.C.'s mouth with his penis. Therefore, we sustain appellant's issue as to count one and reverse the jury's guilty verdict as to count one in trial court case number 1460 (our cause number 03-04-00386-CR).

**Sufficiency of the Evidence as to J.R.**

Appellant contends that the evidence is legally and factually insufficient to support a conviction on count one because when J.R. was asked whether appellant put his mouth on J.R.'s penis "or the other way around," the word "penis" was used instead of "privates." Appellant further contends that the evidence is factually insufficient to support a conviction on count two because J.R. testified that he had seen his grandmother and appellant naked in Lubbock and in Eden.

21

J.R. testified in his 2003 interview that appellant "put his privates in my butt, his front part." He was asked whether appellant "put his mouth on your penis or the other way around," and he answered, "Yes, sir." J.R. was asked whether appellant taught him to spit out any "fluid" appellant produced, and J.R. said, "No, sir," but Stephen S. testified that J.R. told him that appellant taught him "how to swallow the liquid or spit it out."

Based on this record, we hold that the evidence is legally and factually sufficient to support the jury's guilty verdicts as to both counts. There is no indication that J.R. was confused as to the meaning of "penis," as opposed to "privates." It was for the jury to consider J.R.'s allegations about his grandmother and to make inferences from and resolve any conflicts in S.'s and J.R.'s testimony. *See Jones*, 944 S.W.2d at 647; *Barnes*, 62 S.W.3d at 298. We will not second-guess the jury's credibility determinations. We overrule appellant's sixth issue on appeal.

**Effectiveness of Trial Counsel**

In his seventh and final issue, appellant argues that he received ineffective assistance of counsel because his attorney did not object during the guilt/innocence phase of trial to testimony of extraneous offenses committed by appellant. He argues that his attorney should have objected to: T.C.'s testimony that appellant touched T.C.'s penis with his hand, made T.C. touch appellant's penis with T.C.'s hand, and put his mouth on T.C.'s penis; J.S.'s testimony that he saw appellant "stick his private up" his sisters' "bootie"; J.R.'s testimony that appellant made J.R. put his penis in appellant's anus; and A.C.'s testimony that appellant put his penis in A.C.'s "private." Appellant did not assert that he received ineffective assistance of counsel in his motion for new trial.

22

To show ineffective assistance of counsel, a defendant must show that his attorney's performance both fell below an objective standard of reasonableness and prejudiced his case. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999); *Blevins v. State*, 18 S.W.3d 266, 271 (Tex. App.—Austin 2000, no pet.). The defendant bears the burden of (1) overcoming a strong presumption that counsel's performance fell within the range of reasonable professional assistance and (2) bringing forth a record showing that counsel's performance was not based on sound trial strategy. *Thompson*, 9 S.W.3d at 813; *Blevins*, 18 S.W.3d at 271. When the record is silent, we will not speculate as to why counsel acted in a particular way. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994); *Mayhue v. State*, 969 S.W.2d 503, 511 (Tex. App.—Austin 1998, no pet.). Without an evidentiary hearing on the issue of effectiveness, the defendant's burden is difficult to meet, and rarely will we find counsel was ineffective. *Blevins*, 18 S.W.3d at 271-72 (quoting *Thompson*, 9 S.W.3d at 813); *see Mayhue*, 969 S.W.2d at 511. We evaluate trial counsel's effectiveness from his perspective at trial, not in hindsight, and we consider the representation in its totality, rather than focusing solely on isolated acts or omissions. *Mayhue*, 969 S.W.2d at 510.

Appellant's counsel was zealous and involved in the case, raising objections, cross-examining the State's witnesses, highlighting inconsistencies within the witnesses' testimony or between testimony by different witnesses, and attempting to further his defensive strategy through appellant's witnesses. Appellant's defensive argument was that the children's memories had been influenced by the questioning to which they were subjected by the Department and that the children's stories were fantasies involving their grandmother, an aunt, and an uncle who was a police officer.

Considering the totality of the representation provided, rather than focusing on the isolated instances of which appellant complains, *see Mayhue*, 969 S.W.2d at 510, appellant has not shown that his attorney's performance fell outside of the range of reasonable professional assistance or prejudiced his case. *See Thompson*, 9 S.W.3d at 812. Further, in this case, the record cannot adequately reflect the motives behind trial counsel's actions. *Rylander v. State*, 101 S.W.3d 107, 110-11 (Tex. Crim. App. 2003); *Blevins*, 18 S.W.3d at 271-72. We will not second-guess or speculate as to counsel's reasoning and trial strategy. *See Mayhue*, 969 S.W.2d at 511. The alleged deficiencies of which appellant complains are not so prominent or damaging as to render counsel's performance, when viewed as a whole, ineffective. We therefore overrule appellant's seventh issue.

**Conclusion**

The evidence is sufficient to support the jury's verdicts as to all counts in trial court case numbers 1458 and 1461 (our cause numbers 03-04-00384-CR and 03-04-00387-CR, respectively), and we affirm the trial court's judgments of conviction in those causes. We hold that the evidence is legally insufficient as to count five in trial court case number 1456 (our cause number 03-04-00382-CR), count five in trial court case number 1457 (our cause number 03-04-00383-CR), count one in trial court case number 1459 (our cause number 03-04-00385-CR), and count one in trial court case number 1460 (our cause number 03-04-00386-CR). We therefore reverse the convictions as to those four counts and render judgments of acquittal as to those counts alone. We affirm the judgments of conviction on the remaining counts in those cause numbers.

_____

24

David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed in Part; Reversed and Rendered in Part

Filed:   May 19, 2006

Do Not Publish